UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JUAN JOSE REYNOSO,
          Petitioner            §
                                 §
v.                                 §
                                 §
NATHANIEL QUARTERMAN    §
Director, Texas Department of     §          4:09 – CV – 2103
Criminal Justice, Correctional     §
Institutions Divisions.          §         Misc. 08-415
          Respondent,  and     §
                                 §
THE ATTORNEY GENERAL OF THE  §
STATE OF TEXAS, GREG ABBOTT   §
      Additional Respondent.     §

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON SENTENCED TO DEATH**

**DEATH PENALTY CASE**

EDWARD A. MALLETT
State Bar No. 12863000
Federal ID No. 442
MALLETT & SAPER, L.L.P.
600 Travis Street, Suite 1900
Houston, Texas 77002
Tel: (713) 236-1900
Fax: (713) 228-0321

Counsel for Petitioner, Juan Reynoso

PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON SENTENCED TO DEATH

Juan Reynoso, currently confined to death row in the Texas Department of Criminal Justice, respectfully requests that this Court vacate his sentence of death, and issue a writ of habeas corpus.

# I. STATEMENT OF CASE

A.  Prior Proceedings

### *Trial*

Juan Reynoso, also known as John,  ("Reynoso" or "John") was convicted of capital murder on May 4, 2004, and sentenced to death on May 12, 2004, in the 263rd Judicial District Court of Harris County, Texas in Cause No. 941651. Clerk's Record ("CR"), 315, 368-370. Reynoso was represented at trial by appointed counsel, Ronald Hayes and Robert Scott.  (CR 020, 308). Reynoso's Notice of Appeal was filed on May 13, 2004. (CR 375). No Motion for New Trial was filed. On May 13, 2004, the court appointed Richard Wheelan to represent Reynoso on appeal (CR 376).

The Court of Texas Criminal Appeals affirmed Reynoso's conviction and death sentence on December 14, 2005.  See *Reynoso v. State*, 2005 WL 3418293 (Tex. Crim. App.) (unpublished). Reynoso did not file a Petition for Writ of Certiorari.

### *State Habeas Proceedings*

On May 19, 2004, Steven "Rocket" Rosen was appointed to represent Reynoso in state habeas proceedings.  About a week later, Reynoso wrote the court asking to withdraw his habeas appeal.   Thereafter, Reynoso intermittently wrote the court concerning the withdrawal of his

appeal.  The trial court conducted hearings on Reynoso's request on August 30 and November 28, 2004, and at the last hearing he withdrew Rosen's appointment.  Rosen never contacted or communicated with Reynoso regarding his habeas appeals and he did not appear at either hearing.  *See* State Habeas Record, Ex parte Reynoso, No 941651-A, Findings of Fact, Recommendation and Order, 5/4/07, 263rd District Court, Harris County.

On March 2, 2005, Reynoso wrote a letter advising the trial court that he wished to pursue his habeas appeal.  Upon receipt of the letter, the court granted a 90 day extension to file a state habeas application.  At a hearing on April 4, 2005, Reynoso reaffirmed his desire to pursue habeas relief and the court reappointed Rosen.  Rosen was not present at the hearing and did not visit or contact Reynoso following his reappointment.

About a month later, Reynoso again advised the court he no longer wished to pursue habeas and does not want Rosen to represent him.    On May 19, 2005, Attorney Sid Crowley visited Reynoso on Rosen's behalf, but Reynoso informed him that he had dropped his appeal. At no time did Rosen or anyone else acting on his behalf confer with Reynoso concerning his state of mind or the reasons behind his requests.  *Id.*

On June 22, Reynoso wrote the court apologizing for his latest letter and telling the court he wants to pursue his appeals, but he did not want Rosen to present him.  On July 11, 2005, Rosen filed a state habeas application.  *Id.*  Application for Post-Conviction Writ of Habeas Corpus, filed July 11, 2005.   Rosen did not contact or communicate with Reynoso either before or after filing the application.

In November 2006, Reynoso learned that Rosen had filed a habeas application with only

one claim and that he no longer considered himself to be representing Reynoso.   In response, Reynoso filed a *pro* se motion in the Court of Criminal Appeals asking for new counsel and an opportunity to file a proper state habeas application.  The Court of Criminal Appeals remanded the case to the trial court for a hearing and fact-finding.  Ex parte Juan Jose Reynoso, No. WR-66,260-01 (12/20/2006).  On May 4, 2007, the trial agreed entered an order recommending that the application filed by Rosen be withdrawn, and that Reynoso be appointed new counsel and granted additional time to file another  state application for a post-conviction writ of habeas corpus.  The Court of Criminal Appeals rejected the trial court's recommendation, and after supplemental briefing on the timeliness of  Rosen's application, deemed it timely and denied relief on Rosen's one-claim application.  *Id.*  Order,  July 2, 2008.

## *Jurisdiction*

This Court has subject matter jurisdiction over this cause pursuant to 28 U.S.C. § 2241(d) because Reynoso was convicted and sentenced to death by a jury in the 263rd Judicial District Court of Harris County, Texas.

## *Standard for Habeas Relief*

The State petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) amendments to 28 U.S.C. § 2254. Therefore, the AEDPA applies.

The standard for habeas relief is 28 U.S.C. § 2254(a), "a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). For claims that were previously asserted in state court, a

federal court may grant habeas relief if the state court disposition of those claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented during the state court proceedings." *Id*. § 2254 (d); *Jones v. Jones*, 163 F.3d 285, 200 (5th Cir. 1998).

## II.  STATEMENT OF FACTS

### A.  Guilt Phase

#### ***Prosecution's Evidence***

On March 2, 2003, George Jiminez ran into an acquaintance, Tonya Riedel, near a neighborhood convenience store.  He bought her something to eat from the store. 12 R 92-93.[1] Jiminez knew Reidel as "Shadow," and knew that she was homeless.  12 R 90-91.

As Jiminez and Reidel left the store, Reynoso approached them, pulled out a gun, and demanded money.  12 R 95.  Jiminez gave Reynoso twenty dollars and began to back away.  12 R 95, 98.  Reynoso then turned toward Riedel and demanded her money. 12 R 97.  She told him she did not have any money; she fell to the ground.  12 R 98, 100.  He then shot her in the chest. 12 R 98, 100-101.  A car drove up, Reynoso got into it, and the car drove away. 12 R 101-102. Two other witnesses saw or heard the shooting and saw the shooter flee.  12 R 139-144, 164-165. Reidel later died from the bullet penetrating her lung. 12 R 85.

Later that night, Reynoso told two friends, Eugene Reyes and Asa Cruz, that he had shot a woman, because when he tried to rob her she didn't have any money. 12 R 181, 187, 211.  The

---

[1] Citations to the Reporter's Record appear as:[Vol#] R [Page #].

next day, Reynoso entered the tattoo shop of Frank Habisreitinger, and requested a teardrop

tattoo because he had just killed someone.  12 R 238-248.

   After his arrest on March 6, 2003, Reynoso gave a videotaped statement confessing to

Reidel's murder.  12 R 13-17, 35-36.  He admitted that he approached a man and a woman at a

Chevron or Conoco off Airline and Cavalcade, pulled out a .45 firearm, and demanded money

from them.  State's Exhibit 30.  He did not shoot the man because he gave him money, id., but he

shot the woman, because she refused to give him any money.  Id.  Reynoso stated that he acted

alone and that he left the Chevron station on foot, not in a car.  He also stated that he was drunk

and high on drugs and never would have done the shooting if sober.  State's Exhibit 25, p.25.

### *Defense Evidence*

   Reynoso did not call any witnesses or present any evidence in his defense.

## B.  Punishment Phase

### *Prosecution's Evidence*

   In support of a death sentence, the prosecution introduced Reynoso's juvenile record and

his adult criminal record as well as evidence that he committed several robberies near the time of

the murder of Reidel.

   Mr. Reynoso was referred to the juvenile courts for a series of offense committed in

December 1993 and during 1994:  terroristic threats, carrying and threatening use of a weapon,

unauthorized use of a motor vehicle, and evading arrest.  In January 1995, he was placed on

Serious Offender Supervision and later committed to Delta Boot Camp.  13 R 97-98; 102-05.  He

remained under the supervision of the juvenile courts and Texas Youth Commission (TYC) until

he turned twenty-one, on November 2, 2000.  14 R 28.  Reynoso's TYC records, 14 R 8-10. Reynoso's juvenile records documented Reynoso's disciplinary history which included nine "incidents" at TYC institution for "self referrals" and disruption of or failure to participate in programs, and several failures to comply with the conditions of probation and parole after his release.   14 R 12-14, 26.

Reynoso's adult criminal history showed several misdemeanor convictions; possession of marijuana, possession of controlled dangerous substance, two burglaries of a motor vehicle and contempt of court:  13 R 164-65.

About a month preceding and immediately following the murder of Ms. Reidel, Reynoso committed six other robberies and one attempted murder: On February 8, 2003 – less than three weeks before the capital murder -- Reynoso robbed four people at gunpoint:  Jilliana Kennedy and Christa Pritchard , who were together at a carwash, 13 R 137-152, Charles Vaughn, at the gas station where he worked, 14 R 87-91, and Wali Muhammed, at the video store where he worked, 14 R 113-122.

On March 1, 2003, David Sauseda was going to an apartment complex, accompanied by his wife, in the early hours of the morning because he knew he could buy beer after hours at a residence in the complex.  In the parking area he was accosted by several robbers.  One had a gun, a second had a knife. The gunman shot him in the leg.  14 R 145-153.  Reynoso was the gunman.  15 R 7-12.

Several hours after the murder of Ms. Reidel, but still on March 2, 2003, Reynoso robbed a convenience store clerk, Tom Nguyen, at gunpoint.  15 R 22-30.  On March 3, Reynoso robbed

Brenda Cortez and her fiancé Felix Stern at gunpoint and took their car.  14 R 173-186.  On

March 4, Reynoso arranged to meet Robert Haynes, a neighbor to whom he owed four hundred

dollars from a marijuana transaction.  14 R 200-203.  Reynoso put a gun to his head and tried to

kill him over the debt. 14 R 202-211.

### *Defense Evidence*

The defense called several family members and friends to testify in the punishment phase

concerning Reynoso's background.  Their testimony showed that, until Reynoso was thirteen, he

was a well-behaved child.  15 R 95-96.  When Reynoso was thirteen, his mother left her husband,

abandoned her family, and lost custody of the children.  Id.; 16 R 33-41.  In the custody of his

father along with his three siblings, Reynoso began to misbehave and get into criminal trouble.

15 R 96.  His grades in school went down.  15 R 97.  Reynoso tried to understand what was

happening to him by telling his father that he missed his mother.  15 R 98.

Reynoso's father was not very involved with his children.  He would work all day, then

come home, sit on the couch and watch television and drink beer after he cooked dinner for the

kids. 16 R 79.  He never noticed that his older son, Armando, and John began to fight all the

time. 16 R 80.  See also 15 R 201.[2]  He apparently did not notice that John also began to use

drugs in 1994, including marijuana and paint thinner.  16 R 91-95.  John's older sister Roxanne

told their father that John needed help, but he did nothing.  16 R 97.

Reynoso's drug use continued from the age of thirteen or fourteen.  16 R 114-124.  In

---

[2]During the punishment phase, but out of the jury's presence, Reynoso sought to admit Defense Exhibit 16, records from the Depelchin's Children's Center, which contained evaluations and assessments of Reynoso's older brother, Armando. 16 R 137-139. The records reported that Armando had physically and sexually abused John.  The records were not admitted.

addition to marijuana, Reynoso smoked "fry" (cigarettes soaked in embalming fluid) and used PCP.  Id.  He also saw a doctor for anxiety, and that doctor provided him a continuing prescription for Xanax.  15 R 210-217.  Friends thought he was abusing Xanax, 16 R 24, and observed that he was "not himself" when he took Xanax.  16 R 114-124.

Reynoso's mother, Velma Vella, testified that four of her brothers – John's uncles – also had drug abuse problems.  16 R 51.

The evidence also showed that, in the years after his mother left and until he was arrested for the murder of Ms. Reidel, Reynoso tried off and on to hurt himself or to commit suicide.  His sister Roxanne saw wounds where he tried to slice his wrists and stomach.  16 R 87-88.  Reynoso's TYC records noted a suicide attempt in 1995, when Reynoso reported anxiety and depression and attempted to hang himself.  16 R 147-149.  Roxanne and other witnesses recounted that Reynoso deliberately drove his car off an interstate overpass.  16 R 87-88; 15 R 148-155.  At about this same time, Reynoso's best friend, Billy Miller, was killed in a drive-by shooting.  15 R 155.  Marisol Molina, Reynoso's girlfriend at the time of his arrest, recounted that Reynoso told her he tried to commit suicide more than once, and he appeared depressed because he could not see his children.  15 R 170.  This pattern continued right up to Reynoso's arrest for capital murder.  15 R 147-148.

There was some evidence that Reynoso became involved in a gang or gangs during the years after his mother left the family.  Reynoso's sister Roxanne testified that John began to hang out with a gang that her boyfriend was in.  16 R 104-105.  A friend, Ronald Ramos, testified that he saw John get beaten up because of some involvement in a gang.  15 R 205-206.

The defense also presented evidence that Reynoso was struggling with the course his life had taken since his mother left the family.  According to Juanita Bustos, John's maternal grandmother, John was a good person who repented his crimes.  15 R 132-33.  Similarly, Isabel Perez, John's cousin, testified that John was polite and respectable when he was younger, but that he began to withdraw when the problems at home started.  15 R 231-233.  Perez stated that the John would cry a lot and called her at the end of February, 2003 – just a few days before the capital murder --  to tell her he wanted to go to church, that he had been "doing shit," and that he was tired.  15 R 231-234.  Marisol Molina, John's girlfriend at the time of his arrest for capital murder, confirmed John's struggle, testifying that he wanted to move to Corpus Christi to get away from the people he hung out with, that he wanted to stop using drugs, and that he wanted her to take him to church.  15 R 174-184.

Notwithstanding his problems, John was a good father who cared deeply for his children.  Linda Robles, the mother of John's children, testified that he was close to his daughter, that he was nice and respectful, and that he tried to be a good father.  16 R 9-14.  Marisol Molina testified that John was a positive person and a loving father.  15 R 168-169, 183.

Finally, Mr. Reynoso testified in his own behalf in the punishment phase.  He testified that on the night of the capital offense he was high on Xanax, in addition to having consumed a large amount of alcohol.  16 R 162-23.  Because of this, he could not remember several of the other robberies.   16 R 164-65.  Reynoso maintained that he would not have committed capital murder if he were not "really messed up."  16 R 166.  Reynoso also testified that he began associating with "delinquent" people and using drugs because he could not cope with his mother leaving, and

continued to use drugs – including cocaine, acid, toluene, and Xanax --  through the time of his arrest for the murder of Ms. Reidel.  16 R 168-167.  He testified that he did stupid things which he did not remember when he mixed alcohol with Xanax.  16 R 177.  He believed he was a normal, loving person who would not hurt a fly when he was not under the influence of drugs. 16 R 192.  During his testimony Reynoso vacillated about what kind of person he is when not using drugs and whether he is a future danger if sentenced to life imprisonment. 16 R 192-193, 209-210, 225-230.

# III. Claims for Relief

## Challenges to Special Issues in Texas Jury Instructions

**Claim for Relief Number 1:**

The Texas Death Penalty scheme is unconstitutional because it omits a burden of proof on the mitigation special issue in violation of the Sixth, Eighth and Fourteenth Amendments.

**Claim for Relief Number 2:**

The Texas Death Penalty scheme is unconstitutional because it does not permit appellate review of the legal or factual sufficiency of the evidence supporting the jury's answer to the mitigation special issue.

**Claim for Relief Number 3:**

The Texas Death Penalty scheme is unconstitutional because the term "probability" in the future dangerousness special issue impermissibly dilutes the beyond a reasonable doubt standard.

***

For brevity, these related claims for relief are grouped in this Petition. Each claim was

11

rejected by the Court of Criminal Appeals (*Reynoso v. State* AP-74,952 (Tex. Crim. App. Dec. 14, 2005) (unpublished) at p. 7). They are presented in the same order discussed in the opinion on direct appeal.

These challenges to §37.071 have previously been disfavored by the Courts, e.g. *Jurek v. Texas* 428 U.S. 262 (1976); *Rowell v. Dretke* 398 F.2d 370 (5th Cir. 2005) at 375-379; and *Ortiz v. Quarterman* 504 F.3d 492 (5th Cir. 2007) at 504-505.

Nevertheless, counsel has a duty to raise issues when there is a potential or foreseeable change in existing law. These claims are facially valid and counsel reasonably forecasts that in the future – perhaps in this case – the courts will reconsider and fully recognize the unconstitutionality of the death penalty under Texas law.

Tex. Code Crim. P. §37.071 provides in pertinent part:

"Sec. 2. (a)(1) If a defendant is tried for a capital offense in which the state seeks the death penalty, on a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment without parole. The proceeding shall be conducted in the trial court…before the trial jury as soon as practicable. In the proceeding, evidence may be presented by the state and the defendant or the defendant's counsel as to any  matter that the court deems relevant to sentence, including evidence of the defendant's background or character or circumstances of the offense that mitigates against the imposition of the death penalty…"

(b) On conclusion of the presentation of the evidence; the court shall submit the following issues to the jury:

(1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society…"

(c) The state must prove each issue submitted under Subsection (b) of this article beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue submitted under Subsection (b) of this Article.

(d) The court shall charge the jury that:

(1) in deliberating on the issues submitted under Subsection (b) of this article, it shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition

of the death penalty;

(2) it may not answer any issue submitted under Subsection (b) of this article 'yes' unless it agrees unanimously and it may not answer any issue 'no' unless 10 or more jurors agree; and

(3) members of the jury need not agree on what particular evidence supports a negative answer to any issue submitted under Subsection (b) of this article.

(e)(1) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b), it shall answer the following issue: Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance of circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

(2) The court shall:

(A) instruct the jury that if the jury answers that a circumstance of circumstances warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed, the court will sentence the defendant to imprisonment in the institutional division of the Texas Department of Criminal Justice for life without parole;

(f) The court shall charge the jury that in answering the issue submitted under Subsection (e) of this article; the jury:

(1) shall answer the issue 'yes' or 'no';

(2) may not answer the issue 'yes' unless it agrees unanimously and may not answer the issue 'yes' unless 10 or more jurors agree;

(3) need not agree on what particular evidence supports an affirmative finding on the issue; and

(4) shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

(g) If the jury returns an affirmative finding on each issue submitted under Subsection (b) and a negative finding on an issue submitted under Subsection (e)(1), the court shall sentence the defendant to death. If the jury returns a negative finding on any issue submitted under Subsection (b) or an affirmative finding on an issue submitted under Subsection (e)(1) or is unable to answer any issue submitted under Subsection (b) or (e), the court shall sentence the defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life imprisonment without parole.

(h) The judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals."

These issues were in the Court's Charge to the jury on punishment.

"Special Issue No. 1

13

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Juan Reynosa, would commit criminal acts of violence that would constitute a continuing threat to society?

Answer

We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is 'YES.'

Special Issue No. 2

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Juan Reynosa, that there is a sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Answer

We, the jury, unanimously find that the answer to this Special Issue is 'NO.'" (CP 368-369).

**Claim for Relief No. 1**:

> **The Texas Death Penalty scheme is unconstitutional because it omits a burden of proof on the mitigation special issue in violation of the Sixth, Eighth and Fourteenth Amendments.**

The relevant constitutional requirements are stated in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 2363; *Ring v. Arizona* 536 U.S. 584 (2002); and *Blakeley v. Washington* 542 U.S. 296 (2004); Also see *United States v. Booker* 543 U.S. 220 (2005), (federal sentencing guidelines constitutional only by severing certain provisions so that additional facts which increase sentence above a statutory maximum are proved beyond a reasonable doubt).

*Apprendi v. New Jersey*, 530 U.S. 466 (2000), held unconstitutional a New Jersey statute allowing a judge to raise the sentence for an offense by a judicial finding that additional facts

14

were proved by a preponderance of the evidence. The Supreme Court determined that any fact which increases the maximum penalty for a crime must be submitted to a jury and proved beyond a reasonable doubt.

*Ring v. Arizona* 536 U.S. 584 (2002) held an Arizona statute unconstitutional because capital defendants are entitled to a jury determination of any fact on which the legislature conditions assessing the death penalty, based on proof beyond a reasonable doubt.

In *Blakeley v. Washington* 542 U.S. 296 (2004), the trial judge found facts which enhanced a kidnapping sentence after a guilty plea, finding that the defendant acted with deliberate cruelty. The aggravating facts were not admitted in the guilty plea. The Supreme Court found, based on *Apprendi*, that the sentence was unconstitutional because the aggravating facts raised the punishment above the punishment otherwise applicable to the crime and had not been found by a jury beyond a reasonable doubt, or admitted by the defendant.

Reynoso could not have been assessed the death penalty without a unanimous negative answer to the mitigation special issue. (Special Issue No. 2) Tex. Code Crim. P. 37.071(e). However, the statute, and the instruction, do not state the amount or degree of evidence required for a negative answer. There is no reference to proof beyond a reasonable doubt, proof that is clearly convincing, a preponderance of the evidence or any standard at all. This violates *Apprendi, Ring* and *Blakeley*.

The jury was instructed to answer the question based on a "circumstance or circumstances" in the evidence. The requirement to answer was limited only to proof by "evidence of a circumstance." The jury was required to answer if unanimously persuaded to

15

answer the question "No," or when at least ten jurors agreed to answer "Yes."

(37.071(e)(2)(B)(2).

If there were no answer the sentence was automatically life imprisonment, but the jurors weren't told that part of the law.

The prescribed statutory maximum for capital murder in Texas is life, unless there is a unanimous "No" answer to the mitigation special issue. Only a unanimous "No" answer raises the punishment to death. This violates the rule that a fact which increases the penalty for a crime beyond the prescribed statutory maximum must be proved to a jury beyond a reasonable doubt.

These legal principles are violated when the sentence is automatically life imprisonment but for the jury answering a specific fact based question in a certain way without their discretion being limited by the requirement that the death-resulting answer be proved beyond a reasonable doubt.

The statutory instruction violates reason, common sense and the ordinary meaning of words in the English language. The Texas legislature, and courts, should not be permitted to circumvent *Apprendi* and its progeny by casting a factual issue, the jury's life-or-death decision about what the evidence proves, in the negative.

In *Ransom v. Cockrell* 62 Fed. Appx. 557, 2003 WL 120807 (CA5) (unpublished by Federal Reporter), last page, the Fifth Circuit stated that "…it is constitutionally permissible to allow a jury…to recommend mercy based on mitigation evidence…" citing Penry v. Lynaugh 492 U.S. 302, 327 (1989) and other cases, including *McClesky v. Kemp* 481 U.S. 279, 206 (1987) (petitioner not entitled to a proportionality review of a death sentence). This jury was not given

16

the option of a normative decision based on "mercy." It was instructed to rely on circumstances placed in evidence – facts – to decide if the mitigation evidence warranted a life sentence.

Therefore, the absence of a burden of proof in the mitigation issue violates *Apprendi, Ring* and *Blakeley*.

**Claim for Relief No. 2**:

> **The Texas Death Penalty scheme is unconstitutional because it does not permit appellate review of the legal or factual sufficiency of the evidence supporting the jury's answer to the mitigation special issue.**

Reynoso seeks a sufficiency review of the mitigating evidence in two contexts: The evidence presented to his jury should be examined. In addition, the evidence available, but not presented, because if Reynoso was denied effective assistance of counsel should be examined. He has suffered an injury – a death sentence – which can only be readdressed when his Petition is granted.

The Constitution requires meaningful appellate review of a jury's decision to impose a death sentence. *Gregg v. Georgia*, 428 U.S. 153, 195 (1976).

Meaningful appellate review in capital cases "serves as a check against the random or arbitrary imposition of the death penalty." Appellate review is an integral component of a state's "constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

Absent a burden of proof, there is no appellate review of the legal or factual sufficiency of the evidence supporting a "No" answer. The other special issues in Art. 37.071 must be based on proof beyond a reasonable doubt. Those issues are therefore reviewable by an appellate court

17

(Tex. Code Crim. Pro. § 37.071(b) and (c).

The Court of Criminal Appeals, and the Fifth Circuit, have noted a distinction in *Apprendi* between facts in aggravation of punishment and facts in mitigation, *Apprendi* 530 U.S. at 490 FN 16; See *Rowell, supra*, 398 F.3d at 378.

However, the 3-paragraph FN 16 in *Apprendi*, at 530 U.S. at 490, discusses the language and includes the declaration that if the Court's *Apprendi* holding were followed by state legislation giving every offense the maximum, subject to reduction through mitigation evidence, such legislation would undoubtedly be unconstitutional (Appre*ndi*, at 490, FN 16, paragraph 2, and cases cited).

Therefore, *Apprendi* teaches that appellate courts may review sentence  reduction statutes that are based on mitigating evidence for constitutionality. The assertion by lower courts that sufficiency and use of mitigation evidence is unreviewable (*Rowell,* 398 F.3d at 378) is not supported by the authority commonly cited, *Apprendi*, 530 U.S. at 490, FN 16, paragraph 2.

Reynoso was unconstitutionally denied appellate review of the answer to the mitigation question.

**Claim for Relief No. 3:**

> **The Texas Death Penalty scheme is unconstitutional because the term "probability" in the future dangerousness special issue impermissibly dilutes the beyond a reasonable doubt standard.**

The constitutional issue is whether issue no. 2 permitted the jury to answer "yes" based on less than proof beyond a reasonable doubt.

*Cage v. Louisiana*, 498 U.S. 3941 (1990) (*per curiam*), discusses the legal principles. The

Court held that certain jury instructions improperly defining the phrase "beyond a reasonable doubt" unconstitutionally diluted the reasonable doubt standard. The critical inquiry is whether the phrase "beyond reasonable doubt" was tainted by other language that allowed the jury to answer the issue based on a burden of proof that is below what is constitutionally required.

For example, it would not satisfy the Sixth, Eighth and Fourteenth Amendment if the instructions on one of the elements of assault with serious bodily injury required the jury to find "from the evidence beyond a reasonable doubt that the defendant *probably* inflicted serious bodily injury, certainly not if the "serious bodily finding" raised the penalty. This Court should conclude no differently about an instruction that allows a jury to find the future dangerousness element of death-eligible capital murder based on an ambiguous phrase which reduces the burden of proof.

Black's Law Dictionary defines the term "probability" as "likelihood; [a] condition or state created when there is more evidence in favor of the existence of a general proposition than there is against it." Black's Law Dictionary 1081 (5th ed. 1979). A lay dictionary defines the term "probability" as "the quality or state or being probable," with "probable" being defined as "supported by evidence strong enough to establish a presumption but not proof." There is, however, also another definition of the word with a much different but commonly applied meaning: "the chance that a given event will occur." Merriam – Webster's Collegiate Dictionary 928 (a ed. 1993); see Hughes v. State, 878 S.W. 2d 142, 148 (Tex. Crim. App. 1992) (setting out similar legal and lay definitions of the word "probability").

A juror seeing the term "probability" in the future dangerousness special issue might have

equated its meaning with the legal definition or the first lay definition: a "more likely than not" burden that closely resembles the preponderance of the evidence standard. Another juror may have refused this definition in favor of the "chance" definition. The jury could be confused, arbitrary and not unanimous in applying a common definition.

Read in context, the first special issue asked the jurors to predict whether a future event will occur. The jurors were asked if there is "any" chance that Reynoso will commit criminal acts of violence that would constitute a continuing threat to society, whether that chance is 1 in 100, 51 in 100, or 80 in 100. The special issue did not ask the jury to answer "yes" to the special issue only if it is "more likely than not" that Reynoso will pose a future danger. "Preponderance" is not a universally understood synonym for "probability."

*Hughes v. State* 878 S.W.2d 142, 146-148 (Tex. Cri. App. 1992) and *Robison v. State*, 888 S.W. 2d 473, 481-82 (Tex. Crim. App. 1994) rejected applying the term "probability" defined as "any percent possibility" rather than "likelihood" or "good chance." In Hughes, the Court of Criminal Appeals noted "the second special issue calls for proof of more than a bare chance of future violence." The Court said that requiring more than a mere possibility that the defendant would commit criminal acts of violence and would constitute a continuing threat to society "prevents the freakish and wanton assessment of the death penalty." 878 S.W. 2d at 148. However, the Criminal Court of Appeals has never required, and Reynoso's trial court did not give, instructions "based on more than a bare chance" to prevent "freakish and wanton assessment of the death penalty.

Regardless of what definition of the term "probability" each of Reynoso's jurors used to

20

answer the future dangerousness special issue, there can be no question that they were permitted to focus on "probability," which obviously diluted the reasonable doubt standard.

When a jury's finding of future dangerousness is based on a mere preponderance standard – or less – and authorizes an increase in the punishment for capital murder, from life to death, it is appropriately characterized as "a tail which wags the dog of substantive offense." *Apprendi*, 530 U.S. at 495 (internal quotation marks and citation omitted).

The jurors were also encouraged to speculate by the use of the phrase "would commit criminal acts of violence." The jurors may well have speculated that "anyone who would commit the capital murder for which they found Reynoso guilty, "probably would" commit criminal acts of violence." The Texas Court of Criminal Appeals approved this form of speculative decision making when holding that a verdict on the future dangerousness issue can be supported by the facts of the crime alone. *Kunkle v. Stale*, 771 S.W. 2d 435, 449 (Tex. Crim. App. 1986) and *Willingham v. State* 897 S.W. 2d 351, 356 (Tex. Crim. App. 1986). In Reynoso's trial the state had no separate burden to prove that the defendant is a future danger. The phrasing of the issue, "…probability…would commit…would constitute a continuing threat…," taken as a whole, is uncertain and ambiguous. This language also invites decision making based on less than proof beyond a reasonable doubt.

Therefore, an essential fact which had to be proved before Reynoso could be sentenced to death was not based on proof beyond a reasonable doubt, as is required by the United States Constitution.

## Claim for Relief No. 4

**Reynoso was deprived of his Sixth Amendment right to effective assistance of counsel with respect to the penalty phase of his trial because trial counsel failed to conduct a reasonable social history investigation; failed to obtain proper and relevant psychological, neurological, and mental health evaluations and failed to reasonably prepare for the presentation of the limited information he had from witnesses and records.**

In *Strickland* v. *Washington,* 466 U.S. 668 (1984), the Supreme Court held that counsel was constitutionally ineffective if his or her conduct so undermined the proper functioning of the adversary process that the trial could not be relied upon as having produced a just result. *[d.* at 685. To determine whether counsel has been ineffective, a court must undertake a twofold inquiry: whether counsel's performance was deficient; and, if so, whether the deficient performance was prejudicial to the defense. *Id.* at 687.  Counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland.* 466 U.S. at 690-91.  Counsel's deficient performance is prejudicial when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

## A. Deficient Performance

**Trial Counsel Were Deficient for Failing to Conduct a Reasonable Penalty Phase Investigation**

### *The Applicable Standard of Care in Capital Sentencing Proceedings*

By the time of Reynoso's 2004 trial, the Eighth Amendment plainly required sentencers in capital trials to consider the background and character of the defendant. *Lockett* v. *Ohio,* *438*U.S. 586, 604 (1978); *Eddings* v. *Oklahoma,* 455 U.S. 104 (1982). The "background" of an

accused meant anything in that person's life history, such as deprivation, suffering, and human frailty that might cause the sentencer to choose life instead of death.  As, Justice O'Connor wrote in her foundational concurring opinion in *California* v. *Brown,* 479 U.S. 538, 545 (1987), "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."

In the past 10 years, the Supreme Court has reaffirmed this all-encompassing view of mitigation and found trial counsel ineffective for failing to investigate potential mitigating evidence in *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 347 (2005).  In *Williams*, the Supreme Court held that defense counsel in capital cases have an "obligation to conduct a thorough investigation of the defendant's background," 529 U.S. at 396, in order to make reasonable professional judgments about presenting mitigating evidence.   The Court found Williams' trial counsel ineffective for failing to prepare the mitigation case until a week before trial and failing to conduct an investigation of the readily available mitigating evidence.  In *Wiggins,* the Court articulated in much more explicit terms the scope of the mitigation investigation that must be conducted. Drawing upon the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the Supreme Court found trial counsel deficient in their performance, even though they had had their client examined by a mental health expert, because they failed to conduct a complete social history investigation.  In *Rompilla*, counsel were

found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health experts.

The Court's analysis of counsel's deficient performance in these cases applies equally to the analysis of the performance of Reynoso's counsel.  Trial counsel's conduct in this case similarly fell short of the standards for capital defense work articulated by the American Bar Association which serve as "guides to determining what is reasonable." *Strickland. supra,* at 688, 104 S.Ct. 2052; *Williams* v. *Taylor, supra,* at 396, 120 S.Ct. 1495.

The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1 (c), p. 93 (1989) (emphasis added).  Despite these well-defined norms, Reynoso's counsel waited until shortly before trial to begin the penalty phase investigation of petitioner's background and acquired only rudimentary knowledge of his history from a narrow set of sources.

In a proper penalty phase investigation, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings." Gary Goodpaster, *the Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 323. (1983). Under the ABA Guidelines and Supreme Court decisions, a thorough social history of the client's life is required in order  to discover "all reasonably available mitigating evidence," in other

words to discover the kind of information that often leads to a life sentence -- the existence of childhood deprivation, physical and emotional abuse, exposure to trauma, cognitive impairments, psychiatric disorders, PTSD and other trauma related mental disorders, mood disorders, drug addiction, a genetic predisposition to mental disorders and/or substance abuse, previous head injuries and other possible causes or signs of brain damage.   If done properly, a social history provides the defense team and ultimately the sentencer with insight and understanding.  It is also the gateway to an appropriate and reliable mental health evaluation .

A thorough social history is essential to both the lawyers and mental health experts in determining what to test for and why.  Furthermore, mental health experts must have thorough and accurate social history information to conduct reliable evaluations.  *See* Richard G. Dudley, Jr. and Pamela Blume Leonard, *Getting it Right:  Life History Investigation as the Foundation for a Reliable Mental Health Assessment,* 36 HOFSTRA L. REV. and Douglas Liebert and David Foster, *the Mental Health Evaluation in Capital Cases:  Standards of Practice,* 15:4 Am J. FORENSIC PSYCHIATRY 43 (1994).

A reasonable social history investigation requires *both* interviewing numerous individuals *and* gathering a broad range of documents. These interrelated processes are time consuming and must be started long before trial:

> A complex, multilayered analysis of the client's life - a social history - helps the jury to understand the causes of the violence they examined in the guilt phase of the capital trial. As Professor Craig Haney has observed, social histories are not excuses, they are explanations. [] *A key element in social history investigation is the collection of reliable, objective documentation about the client and his or her family.* This record gathering needs to be accomplished confidentially, using broad authorizations for release of confidential information signed by the client, parents, siblings, caretakers, and significant others. The safest policy is to get everything, not to self-censor. A hospital may ask, for example,

"Do you really want *dental* records?" What relevancy might dental records have to mitigation or mental health claims? In one case, they uncovered a powerful story of a teacher because his teeth had rotted from malnutrition and poor hygiene. *The search for records typically includes birth certificates and genealogical archives; prenatal, birth, and pediatric charts; physicians, hospitals, and mental health records; school, social service agency, juvenile court, employment, Social Security, and workers compensation files; military records; marriage and divorce files; death and autopsy records; correctional, probation and parole records; court files and litigation records.* [] Investigating the capital client's biography is a sensitive, complex, and cyclical process. It is cyclical, rather than linear, because witnesses will need to be re-interviewed when new information has been discovered. As veteran mitigation specialist Lee Norton observes:

> The investigation is not complete until the information uncovered becomes redundant and provides no new insight. It is insufficient to talk to witnesses only once because each new individual recalls different facts and anecdotes; if an aunt provides an account of a head injury which the mother forgot to mention, it is necessary to go back to the mother to ask about it. Similarly, an interview may reveal records that must be obtained, which in turn raise new questions, questions which necessitate interviewing several witnesses again.[]

Russ Stetler, *Mitigation Evidence in Death Penalty* Cases, THE CHAMPION, at 10-11 (JAN/FEB 1999.

An experienced capital defense attorney understands that a proper penalty phase investigation cannot be done during the final few weeks before trial. It takes longer than that to obtain many of the necessary records that can lead to critical information and witnesses; and record review is tedious and time consuming, but critically important. Most often, the initial interviews with family and friends are incomplete. It takes time to develop the kind of relationship that is necessary to break through natural defenses and reticence when discussing personal matters involving sensitive and sometimes embarrassing and painful memories. Also

memories fade and not everyone immediately recalls the most important information.   One

witness's account of a critical piece of information may require the mitigation specialist to return

to a previously interviewed witness to confirm and document the important information.   In the

initial interviews, the mitigation specialist will inevitably identify additional witnesses who can

provide accurate and reliable information about significant experiences or critical stages of a

client's life.   Likewise, it is important to inquire about ways to corroborate significant

information through other witnesses and/or documents.  These are a few of the many reasons

both the 1989 and 2003 ABA Guidelines require that the penalty phase preparation and

investigation begin "immediately upon counsel's entry into the case,"  1989 ABA Guideline

11.4.1.  *See also* 2003 ABA Guideline 10.4(C).

### *The Pre-Trial Penalty Phase Preparation*

The trial court initially appointed Terrance Gaiser to represent Reynoso, but he

subsequently  withdrew when he realized he had a conflict of interest from his previous

representation of a criminal defendant against whom Reynoso had testified as a state's witness.

CR 5.  Gaiser did not conduct any investigation or other sentencing phase preparation during his

appointment.  On August 22, 2003, the court appointed Ronald N. Hayes to replace Gaiser.  CR

20.

On October 30, 2003, the court appointed Marc Carter as co-counsel; and less than three

months later, he moved to withdraw because he had been appointed  district judge in Harris

County.  CR 25.  On May 4, 2004, shortly before the trial began, the court appointed Robert R.

Scott  to replace Judge Carter as co-counsel.  CR 308.  Neither Ronald Hayes nor co-counsel

conducted any penalty phase investigation themselves nor did they have any meaningful

conversation with Reynoso in preparation for the penalty phase of his trial.

### *Social History Investigation*

A few weeks before the trial began, Hayes requested and the court approved funds for a

mitigation specialist, and shortly thereafter, counsel employed Gina Vitale.  CR 24.   According to

Vitale, the mitigation investigation was severely hampered by insufficient time.  Before trial, she

obtained and reviewed Reynoso's Texas Youth Commission (TYC) records, and she interviewed

Reynoso once and his older sister, Roxanne, once.  She also communicated with Roxanne by

email and telephone, and she talked briefly to Reynoso's mother, Velma Vella, by telephone.  All

other interviews Vitale conducted took place during the trial at the courthouse.  Vitale asked

Velma and Reynoso's older sister, Roxanne, for names of people who were willing to testify, an

either subpoenaed them or asked Velma and Roxanne to call them,  essentially delegating to

them the task of identifying penalty phase witnesses.

During trial, Vitale conducted brief interviews with family members and friends who

were attending the trial.  When time permitted, she prepared "bullet point" summaries of the

highlights of her interviews which Hayes reviewed before calling the witness to testify. Except

for the "bullet points," Hayes had very little, if any, information about the witness. No one

pursued any additional investigation based on the information obtained from these witnesses, nor

did anyone explore the mental and psychological implications of the information they had.

Vitale had very few conversations with Hayes concerning her investigation.  She reports

that when she talked to him during trial, he seemed distracted and unfocused.  During the

weekend between the close of penalty phase testimony and the closing arguments, Hayes had a stroke and was unable to continued with the trial.  When co-counsel Scott informed her of this, he also told her that Hayes had been having mini-strokes during the trial.

Scott gave the closing argument.   Vitale never had any conversation with Scott about the penalty phase investigation either before or during the trial.

### *Mental Health Evaluation*

On March 17, 2004, the trial court also approved funds for an independent mental health expert.  (Clerk's Record at 117).  On April 13, 2004, the second day of jury selection, Hayes faxed the court's order to a psychologist, Floyd Jennings, Ph.D, with a very short letter asking him to "see Reynosa as soon as possible."  Hayes provided Jennings with a copy of Reynoso's school records and a videotape of his confession to police officers.

On April 28, 2004 Jennings conducted a clinical interview of Reynoso that lasted slightly less than two hours.  He obtained basic information from Reynoso concerning his family history and educational background.  He determined that Reynoso understood the court proceedings and that he did not satisfy the legal criteria for an insanity defense.  Jennings also noted that areas of potential mitigating evidence were deliberately closed off by some of Reynoso's statements to him.  For example, Reynoso denied that two previous hospitalizations for alcohol poisoning and a drug overdose represented suicide attempts and he maintained that he had a 'good childhood' but "made some bad choices.'"  Jennings Report dated 4/28/04.  Jennings also reported that Reynoso "related in a cooperative, if sardonic fashion;" his cognitions were intact; his mood was "neither depressed nor elated;" and there was no evidence of "delusions, hallucinations, or ideas

of reference." *Id.*

Based on one clinical interview, the school records, and the confession, Jennings concluded that Reynoso "ha[d] a severe character disorder, resulting in antisocial behavior but no evidence of a mental illness as such." He invited counsel to contact him if he had contrary evidence from collateral sources such as family members. *Id.* Counsel did not consult further with Jennings and did not provide Jennings with the contrary information obtained by Vitale. Vitale never saw Jennings' report.

### *Presentation of Penalty Phase Defense*

As a result of counsel's unreasonable delay in commencing the penalty phase investigation, counsel was unfamiliar with Reynoso's life history and therefore unable to prepare or present a credible, coherent, penalty phase defense. Since Hayes' examination of witnesses was based solely on one page bullet points prepared from interviews conducted during the trial, he essentially learned what the witnesses had to say as he listened to their testimony. The testimony often had no cohesiveness and no context. When he veered off script, Hayes frequently asked questions the witnesses didn't understand. For example, he asked Stephenie Collier, a friend of John's sister, if John "had been filed on" when she first met him, and she didn't understand what he was talking about. When he made it clear that he was talking about charges for criminal conduct, she didn't know whether he had or not.

At times, he seemed to misread the bullet points without ever realizing it. Kash Clindo was one of John's very best friends and when they were 14, John accidentally shot him while they were playing with a loaded gun. Kash was seriously injured but recovered. He died several

years later in a car accident while John was in TYC.  Both the accidental shooting and Kash's later death were significant events in John's life and had a huge impact on him.  When questioning Kash's brother, Ronnie Ramos, Hayes asked him if John had been involved in his brother's death.  When he said no, Hayes asked him if Kash was shot and killed?  When he said no, that Kash died in a car accident,  Hayes dropped the subject and asked Ronnie if he has ever been convicted of a felony.  15 R 196.   After running out of bullet points, Hayes asked Ronnie questions without having any idea what his answers cold be.  Apparently seeking information on how John behaves when using drugs, Hayes asked Ronnie if he had ever seen John "in fights with anybody, attack anybody, hurt anybody."  Ronnie said yes, and he described a time when he saw John getting beaten up to get out of a gang.  Hayes switched subjects, and asked if Ronnie knew John to be in a gang, then the name of the gang, and when the fight occurred.  Without any follow-up to Ronnie's answers, Hayes passed the witness. The significance of the questions to mitigating evidence, if any, is never revealed.  15 R 204-205.

At time Hayes also seemed to have forgotten the state's evidence or to have confused it with evidence from another case.  When questioning Isabel Perez, John's great aunt, he explained to her that "there has been evidence presented that [Mr. Reynoso] has done a lot of really bad things.  Maybe 10 or 11 or 12 robberies and aggravated robberies and shooting people and trying to shot people."   R 230.  In fact, the state presented, at most, evidence of 6 or 7 robberies.

These are only a few of the many examples of trial counsel's being unprepared and having failed to prepare his witnesses.

### *Deficiencies in Penalty Phase Investigation and Preparation*

Trial counsel's penalty phase investigation and preparation was deficient in the following ways:

- Trial counsel did not obtain the services of a mitigation specialist and the penalty phase investigation did not begin until a few weeks before trial.

- The penalty phase investigation was deficient in the following ways:

  - failure to obtain all social history records pertaining to Reynoso and other family members;
  - failure to interview any of the numerous witnesses who created the records that were obtained;
  - failure to interview critical members of Reynoso's family;
  - failure to investigate anything about Reynoso's early life before the age of 13;
  - failure to investigate and document Reynoso's exposure to major trauma from early childhood into his adult life;
  - failure to investigate and document Reynoso's gang involvement at the early age of 13, why he joined gangs, and how it impacted his life;
  - failure to investigate evidence of symptoms exhibited by a highly traumatized person, many of which were apparent the records that were obtained and witnesses who were interviewed, including unexplained trouble with schoolwork, using drugs at an early age, angry outbursts, discipline problems at school, intense anxiety, survivor's guilt, depression and hopelessness, foreshortened sense of future, tremendous self medication and drug addiction, suicidal thoughts and attempts. taking dangerous risks. nightmares related to traumatic events, refusal to follow rules;
  - failure to investigate the signs and symptoms of numerous mental disorders, including post-traumatic stress disorder, mood disorder (long-standing depression, bi-polar disorder);
  - failure to investigate and document a history of mental illness and substance abuse in Reynoso's extended family;
  - failure to investigate the likelihood of brain damage resulting from numerous instances of head trauma, long term exposure to alcohol, alcohol poisoning, drug overdose, long term abuse of PCP/embalming fluid, paint thinner, and xanax, and anoxia from attempted hanging;
  - failure to investigate the potential side-effects of the drugs Reynoso was using;

32

- failure to investigate underlying causes of extreme panic attacks accompanied by tremors;
- failure to investigate underlying causes of seizures;
- failure to investigate the consequences of having long-term, unrecognized and untreated mental disorders;
- failure to investigate the circumstances surrounding Reynoso's relapses following significant improvement in TYC and after release on probation;
- failure to consult with appropriate mental health professionals regarding evidence of emotional and mental disorders that were apparent from the obtained records and witness interviews; and
- failure to interview people who were around Reynoso during the time preceding the robberies and capital offense

- Counsel's trial preparation was deficient in the following ways:

  - failure to familiarize himself with the results of Vitale's investigation or discuss information not contained in the bullet points;
  - failure to reasonably prepare for the examination of penalty phase witnesses;
  - failure to prepare witnesses prior to their testimony;
  - failure to review and discover relevant information in available juvenile records;
  - failure to interview any of the state's penalty phase witnesses; and
  - failure to review the juvenile records that state intended to introduce in order to  to object to inadmissible hearsay in records and correct misrepresentations of the records by the witnesses testifying from them.

## B. PREJUDICE FROM COUNSEL'S
## DEFICIENT PERFORMANCE

### *Legal Standard*

For a successful claim of ineffective assistance of counsel, must show that the deficient

performance of his trial counsel prejudiced his defense creating a reasonable probability that the

result of the proceeding would have differed but for trial counsel's errors. *Strickland v.*

*Washington,* 466 U.S. at 687, 694.  A "reasonable probability" is a probability sufficient to

undermine this court's confidence in the outcome of the proceeding. *Id.*  In assessing prejudice, the court considers "the totality of the mitigating evidence adduced both at trial and in the habeas proceedings," *Williams*, at 397-398, and determines whether there is a reasonable probably that such evidence "would have affected the sentencing decision of at least one juror."  *Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003).

### *Summary of Available Mitigating Evidence*

Contrary to the picture presented at trial of a trouble free childhood before the age of 13, Juan Reynoso known as John to his family and friends,[3] spent his first eleven years in an extremely poor, crime ridden, drug infested neighborhood in northwest Houston.  He was exposed to violence, drugs and alcohol abuse both in his family and his neighbor, and he had a genetic predisposition to addiction.  John was also the victim of physical abuse at home by his older brother.

In his pre-teen and teenage years, John Reynoso endured numerous betrayals and abandonment by people he loved and looked to for protection and support.  At the same time, he found himself in a world rife with real danger, real trauma, and inescapable pain with no one to protect him and comfort him,

Throughout his early life, John's mother was John's only source of parental guidance and affection; although Juan Sr. cared deeply for his children, he was unable to show them affection; to the contrary, he was verbally abusive and cruel, calling the children by derisive nicknames; and yelling and throwing things at them when he was upset.  After his mother left the home in

---

3 Hereafter, the petitioner will be referred to as "John" or "Reynoso" to distinguish him from his father, also Juan Reynoso, who will be referred to as "Juan Sr."

34

early 1993, John had absolutely no adult guidance or supervision.  At this vulnerable age, he was introduced to gangs by his sister's older boyfriend, and they became his substitute family.   As a 13-14 year old gang member, John was exposed to extraordinary trauma – gang fights, drive-by shootings, beatings.  To cope with the resulting fear and trauma and its effects, John turned to drugs.  At 15, he accidentally shot his best friend who later died in a car accident while John was in TYC.  That same year as his best friend's death, his second best friend was killed when someone blew his head off with shot gun.  As the trauma and its effect increased so did the drug use.

Throughout John's teenage years and into his early twenties, he exhibited increasing signs of the serious and debilitating effects of prolonged exposure to trauma as well as other mental disorders. He experienced constant depression co-existing with extreme anxiety. He repeatedly expressed suicidal thoughts and attempted suicide on numerous occasions. He developed behavior problems at school; he engaged in high risk behavior. He was quick to anger and he lashed out at those in authority.  He sought relief in increasing use of marijuana, sniffing paint, PCP/embalming fluid (fry), and eventually excessive use of the prescription drug Xanax.  The symptoms and seriousness of John's mental disorders got worse in his early twenties.

The likely mental disorders and their symptoms included:  post-traumatic stress disorder or other trauma related mental disorders (symptoms:  survival guilt after losing several friends to violence, hyper-reactivity to perceived betrayals, paranoia, panic disorders, nightmares of someone trying to kill him and being unable to defend himself, hypervigilance. foreshortened sense of future (belief that he would die young), depression, hopelessness, self-medication with

drugs; suicidality/history of suicide attempts, frequent crying); and mood disorders such as major depression and bipolar disorder (symptoms:  both depression and extreme anxiety, suicidal thoughts and suicide attempts, binge and charged behavior, self-medication with drugs).  Despite clear signs of distress, John's mental disorders, often overlaid with drug use, went undiagnosed and thus untreated.

In addition, John showed signs of organic brain damage or dysfunction and had a history of risk factors that called for an investigation of possible neurological disorders.  He suffered blackouts and seizures as well as tremors.  He suffered numerous head injuries as a child and abused dangerous drugs (sniffing paint and PCP laced with embalming fluid), and he was exposed to extraordinary trauma during the critical years of brain development.

If a thorough and timely social history had been conducted, the repeated exposure to trauma and the related drug abuse and the signs of mental disorders and possible brain damage would have been discovered and with appropriate evaluation, counsel could helped the jury see and understand the sad progression in John's life that led to his violent behavior.  Seen through the eyes of a 13 year old who was traumatized, frightened and alone except for his gang friends, John's drug use and macho behavior comes across more as symptoms and early cries for help.  But instead of finding help, John found himself on a speeding train that seemingly had no escape.  In this context, his repeated suicide attempts and desperate cries for help ring true.

*Juan (John) Reynoso's Life History*

**John's Father - Juan Reynoso Sr.**

John's father, Juan Reynoso Sr. ("Juan Sr.") was born on November 21, 1950 in Mexico where he was raised in severe poverty.  His father worked in the United States and only infrequently returned to Mexico and his family. Consequently, Juan Sr. had very little in terms of a paternal role model. The children in Juan Sr.'s family earned money by selling gum or shining shoes to help their mother pay bills.

Juan Sr. moved to the United States in the early 1970s.  In 1974 he became a United States citizen.  For years, Juan Sr. has drunk a six pack or more of beer every evening between the time he gets off work and goes to bed.  His brother, Jesus, died at the age of 30 from an alcohol-related illness.  Juan Sr.'s idea of fatherly responsibility is narrowly understood as providing financial support.  As a husband and father, he often expressed his anger and impatience, but he rarely showed affection.

**John's Mother - Velma Vella**

Velma and her twin sister, Norma, were born in 1957 and were the second and third children of Juanita (Janie) Bustos.  They have an older brother, Jerry, and three younger brothers, Frank, Bruce, and Michael.  Janie was married 5 or 6 times and had numerous other relationships.  Frank, Bruce and Michael have different fathers.

Velma and Norma had a very limited relationship with their father, Ray Vella.  They stayed briefly with him when they were young girls, during which time he would introduce them as his "sisters" rather than his daughters.  Neither sister currently maintains any relationship with

37

him.

With each romantic relationship, Janie would "shuffle off" Jerry and the twin girls to live with whatever relative would agree to take them, and they never lived any length of time in any one place or with any one relative.  Velma reports Norma was sexually molested by one of their stepfathers.  Their grandfather was an alcoholic, and all of their brothers have had lifelong problems with alcohol and drugs including marijuana and crack.

Velma and Norma were and continue to be close. At 15, Norma became pregnant and married her child's father, Valdmar Flores. At that time, Velma was living on her own and "walking the streets."   Of the two, Norma says that Velma was "the wild one." (Norma Interview).   By age 19, Velma had given birth to her first son, Armando Vella (DOB 3/6/76). Velma cut off contact with Armando's father.  In 1977, Velma gave birth to Roxanne. Her father was the brother of Norma's husband.  The next year Velma again became pregnant out of wedlock and gave this child up for adoption.

## John's Early Life

Juan Sr. and Velma met around 1975 and were living together when John was born on November 29, 1979.  They got married on January 26, 1981, four months before the birth of their daughter, Angela, on April 23, 1981.   Velma says that she married Juan primarily because of the security he could provide her and her children.  For most of their marriage they slept separately from each other.

During John's pre-school years, he and his family (parents, Armando, Roxanne, and Angela) lived in a three room, run-down house in northwest Houston called the Monte Beach

area, named after a nearby park.  The neighborhood is known for drugs and violence and is described by John as a "ghetto."  The family moved to a three bedroom house in a nearby neighborhood when John was about 5 years old, but the children continued to spend a lot of time with Velma's relatives, who lived in the Monte Beach area.  Though the house was larger, it too was old and in disrepair.  John's mother sometimes had to heat water for baths because of problems with the hot water heater.

At a very young age (under 10), John and his brother Armando "ran the streets" and "hung out" at Monte Beach park.  They would seeing people fighting in the park, and hear "gun shots going off" in the neighborhood during the day and night.   They would also find syringes in the park left by drug users.

Velma's aunt, Chris, still lives in the Monte Beach area where she has run a pool hall for more than 20 years.  Throughout John's early years, Velma and the children often gathered with other members of Velma's extended family (sister, aunts, uncles, cousins, nephew and nieces) at Chris' house and the pool hall, or at the nearby park, particularly for holidays.  During these gatherings, the children were around adults who were drinking heavily and having heated arguments that frequently lead to violence.

Witnessing family members being threatened with or inflicting bodily harm can be exceedingly traumatizing for a young child, and the adverse psychological effects of such exposure are greatly magnified when a child is repeatedly exposed.  A child who is traumatized prior to age 11 is "three time more likely than those who experienced their first trauma as teens to develop psychiatric symptoms."  Garbarino, J. Dubrow, N. Kosteiny, K. & Prado, C (1992)

*Children in Danger*.  San Francisco: Jossey-Bass, p. 51.

### Early Elementary School Years

John attended Roosevelt Elementary School from kindergarten to the middle of the 5th grade.   He was a good student in the early grades, and his dad would give him $5.00 for every "A" that he made.  In 1st grade John earned a 90 average, and in 2nd grade his average was 98. In 3rd grade, he averaged 86.  In 4th grade his average dropped to 74, but he still was promoted.  The drop in John's grades coincided with increasing behavioral problems with Armando -- physical abuse (of John) by Armando and abuse of Armando by Juan Sr. – together with family financial difficulties and a serious deterioration in Velma's and Juan Sr. relationship.

At Roosevelt, John participated in numerous school activities.  He played a triangle in the band and participated in the Christmas programs.  During the 5th grade, as the school's mascot, John wore a bear suit and did flips at school events.  John's mother enrolled him in a nearby YMCA where John played football, basketball, and went swimming.  He played T Ball at a nearby park and played baseball at Norhill and Studewood Park.   John describes himself as being like a "dork" or "nerd" during this time.  He was neat; he combed and parted his hair and wore "dress clothes."  Juan Sr., who had derisive Spanish nicknames for the children, called John "girl."   The nicknames for the other children were the Spanish names for:  "God" for Armando, "chicken leg" for Roxanne, and "pig without a tail" for Angela.

During his early school years, Velma was the only parent actively involved in John's life.  She cooked breakfast for the children before school, encouraged them to participate in school activities, enrolled them in YMCA activities, and attended school events.   Juan Sr., on the other

hand, was not involved in the children's lives, and he did not attend the children's school events. Although Juan Sr. understood some English, he only spoke Spanish.  The children only spoke English, but understood some Spanish, which contributed to Juan Sr.'s isolation from them and their lives.  Also, Juan Sr. always worked long hours, usually 6 days a week.  After he came home from work, he usually listened to his music or sat in front of the television and drank beer. He communicated very little with his family and he did not show affection toward the children or Velma.  Velma describes him as "hard" and "cold."

Both parents had tempers.  Velma often yelled at the children and tended to punish the children by slapping.  Sometimes she would hit them with whatever she could get her hands on and often used a wooden paddle.  Once she rubbed a jalapeño pepper inside his mouth because he said a curse word.  Juan Sr. also yelled at the children, called them names in Spanish, and threw things at them, such as keys and his heavy shoes.   He often hit them in the head hard with his knuckles.   When John was in the 2nd grade, Juan Sr. slapped him so hard that John still had a hand print on his face when he went to school the next day.  John's second grade teacher reported the incident to Child Protective Services (CPS).   Once, when Velma's sister Norma was visiting, she went into the bathroom not knowing anyone was in there, and saw Armando bent over the toilet; Juan Sr. was beating him with a belt.

John frequently endured abuse from his brother, Armando, who was 3 ½ years older. Beginning when John was 6 and 7 years old, Armando would threaten him with a beating to get John to steal things for him.  When John was 7, Armando gave him his first tattoo.  Counseling records confirm that Armando was aggressive and short-tempered from an early age.  According

to Velma, normal sibling horseplay with Armando would quickly become violent.

In 1988, when John was in the 3rd grade, Armando's abuse of the younger children, including John, had become so bad that Velma and Juan Sr. feared for their safety when they were home alone with him.  He would kick them, hit them, and knock them down.  To protect the other children, Juan Sr. took Armando to work with him.  Juan Sr. and Velma sought family counseling at Depelchin Children's Guidance Center.  After three months in counseling, Armando's conduct at home improved.  By November of 1989, as John was beginning the 4th grade, the family was back in counseling with increasing problems with Armando, but the conflict between Armando and Juan Sr. only got worse.

In 1992, following a fight in which Juan Sr.'s ribs were broken, Armando left the home and went to live with other relatives.   John was visiting his grandmother in Corpus Christi when the fight occurred and when he returned home, Armando was gone.

The problems with Armanda exacerbated the tensions in Velma's and Juan Sr.'s already unstable relationship.  Velma acknowledged to Armando's counselor that she "was full of rage" and that she vented on Juan Sr.  At times, she would hit him and throw things at him.  At other times, Velma and Juan Sr. would not speak to each other.  The family's difficulties became even worse in1989-1990.  Juan Sr. was unemployed during most of 1990, and during that time, Velma was working day and night at two cleaning jobs trying to make ends meet.  They were also facing foreclosure on their home.  During this time, Velma and Juan Sr. fought constantly, and Velma was always yelling at him and the children.  The conflict with Armando and between Velma and Juan Sr. was reflected in John's performance in school.  His 4th grade (1989-90) average fell

below a B level for the first time since he started school.

In the midst of all of this turmoil, the family gave up their house to foreclosure and moved across town to another part of Houston – the Greenspoint area – and John transferred to Link Elementary School where he finished the 5th grade.  This move and the changes in schools brought about significant changes in John's physical and social environment.  At Roosevelt Elementary School, where John went from kindergarten to the middle of the 5th grade, the student body and the neighborhood was predominately Hispanic and many of John's relatives and friends lived nearby.  When the family moved to Greenspoint, John lost contact with his friends.  At Link, John didn't know anyone and for the first time he was going to a school where the student body was composed of a mix of races and cultural backgrounds and where there was tension between students of different racial and cultural backgrounds.  Within a short time, John was having behavior problems in school, and his grades continued to decline.  His final grades for 5th grade were mostly in the 70s.

**Middle School Years**

In the fall of 1991, John enrolled in the 6th grade at Wells Middle School which was different from his previous schools in that its student body was predominately white and, from John's perspective, "rich."   John's new house was located in a lower middle class neighborhood, adjacent to one of the highest crime rate neighborhoods in Houston, near Greenspoint Mall.  The school also had a significant number Black and Hispanic students and there was also tension between the two groups.  John still dressed like a "nerd" and did not have any tattoos, except the one which Armando gave him, but he didn't "fit in," and the transition was difficult for him.

Early on, he had fights with other students and disciplinary problems in class, and by the end of the first six weeks, he was transferred to an alternative school.

Although Velma was still living in the home during this difficult transition, she began to escape the family problems by leaving the home for days at a time.  For a long while, she came home after work, changed clothes, and left without telling anyone where she was going or when she would be back.  At one point, she rented an apartment so that she'd have somewhere else to stay and see friends.  During Velma's absences, Juan Sr. still left for work before the children went to school, and after he came home around 6:00 or 7:00 pm, he spent the evenings listening to music, watching television and drinking beer.  Thus, when Velma was gone, no adult was even around, much less supervising the children.

In his 6th grade year, John began hearing about gangs from Roxanne's boyfriend, Greg Bean, who was about 4 years older and a leader of the local neighborhood/territorial gang called the VCV 13 (a Spanish acronym for "Mexican Dudes with Balls").  Around the same time, John started experimenting with marijuana and sniffing paint.

In the 7th grade and thereafter, John's problems with school work, students and teachers increased significantly.  He was often expelled and transferred to an alternative school for disruption in class, fights and other problems with students.  He failed the 7th grade two years in a row.  The second time, the school nevertheless placed him in the 8th grade because of his age.  John's behavior and failure in school reflected the increasing instability and discord in his life.  Drugs were becoming became John's primary means of escape, and eventually he turned to gangs to replace his lost sense of family.

In late 1992 or early 1993, during John's 7th grade year, the problems between Velma and Juan Sr. came to a head.  Juan Sr. accused her of using drugs and being unfaithful, but when she wanted a divorce, he refused to move out of the house.  To get away from what she thought was an intolerable situation, Velma moved out, taking a lot of the furniture with her.  She moved into a rundown trailer and was joined by the man she had been seeing, who had recently been released from prison.  Juan Sr. filed for divorce and won custody of the children.  Velma asked the children if they wanted to live with her, but the trailer clearly would not have accommodated them, and Velma was not financially able to care for them.

Everyone close to the family says that John was devastated by Velma's leaving.  To John, Velma was the person who took care of him and his sisters.  Of the two parents, she was the only one who was ever there for the children emotionally.  She got breakfast for the children, took them to school, and attended school events and looked after them.  John and the other children felt betrayed and abandoned, and they were angry at their mom for leaving.  At the same time, John felt guilty because he thought she left because of the problems between him and Armando.  To make matters worse, Velma occasionally picked up the two girls and took them shopping, but she never took John.

John's reaction to his mother's absence did not go unnoticed by anyone around him.  He cried to his father that he wanted his mother back.  He cried in telephone conversations with this grandmother about how much his missed his mom.  He would call his mother while he was sitting in his closet and crying and tell her that he wanted her to come home.  But by the end of the conversations, he would try to assure her that he would be okay.

45

After Velma left, the children had absolutely no supervision.  Juan Sr. continued to work long hours, leaving early in the morning and coming home in the evening.  Although he would make sure they had food to eat, they did not interact as a family.  The children (if they stayed home) would eat separately in their rooms and watch their TV.  If one of them sat down in the living room with Juan Sr., he would often say something like, "Don't you have your own TV?"

When Velma left, John also lost the support and security of having an extended family.  The regular family gatherings with Velma relatives (grandmother, aunts, uncles, and cousins) and his frequent trips to Corpus Christi to visit his maternal grandmother stopped, separating John from all of the people in his life who had shown him affection.  Around the same time, John's favorite paternal uncle died and Juan Sr. cut off all contact with his widow and children who were John's age.

## Gang Involvement, Trauma and Betrayal

### *Gangs & Violence*

When Velma moved out, Roxanne was pregnant, and soon thereafter, Juan Sr. allowed Roxanne's boyfriend, Greg, to move into their home.  Greg was like an older brother and became a role model.  Through Greg, John learned a lot more about gangs, and he started hanging out with Greg and his gang friends.  Lacking the kind of protection, nurturance, support and guidance children require during the difficult years of adolescence, John was uniquely vulnerable to the attractiveness of gangs as both substitute family and protector.

While John was only 13 years old, Greg brought him into his gang, the VCVs.  Most of the regular members were 3 to 5 years older, and John was touted as the youngest person ever

officially accepted into the gang.  Although the gang initially gave John a sense of belonging, it soon became of a major source of anxiety and rejection.  Over the next two years, John was exposed to a whole new world – one that was rife with danger, trauma, and pain.

- John learned that there were "enemies".  If a person was a member of an opposing gang, then that person was one of the "enemies."  John never knew why certain people or gangs were "enemies;" they had become "enemies" before John was a gang member, and you didn't question it; that was just the way it was.

- John was with gang members when they were hiding on roofs with guns, waiting to defend against an anticipated drive-by.

- He rode around with gang members armed with guns, looking for "enemies."

- He witnessed and participated in gang fights involving scores of armed gang members on both sides.

- He was the target of drive-by shootings, and he hid on floors with other gang members who feared and were anticipating drive-bys.

- He learned that one of most important gang values was loyalty; if an "enemy" wronged a fellow gang member, the gang retaliated.

- He also learned that your gang family could betray you and turn against you in a flash.

John realized he was dealing with "the real stuff" and that it could get him killed.  In the beginning, John concealed his fear because he wanted the respect and approval of other gang members.  Later he projected a macho and fearless façade in order to survive.  As the gang

activity intensified, John's anxiety increased, and so did his drug use.  Drugs where the only

thing that eased his anxiety, and they also helped him hide from his fear.

### *1993-94:  Gang Violence, Trauma and Betrayal*

During John's first year and a half as a gang member (when he was 13 and 14 years old),

he witnessed and/or participated in large, armed confrontations with opposing gangs; fights with

members of his own gang; drive-by shootings; threats on his and his families lives; betrayal and

abandonment by his gang family.

One of John's first encounters with a gang drive-by shooting took place in automobiles.

He and a couple of older gang members drove past a service station where they saw about six

cars and a crowd from three or four different gangs who were giving each other a hard time.

John and his older cohorts pulled into the station and joined in the haranguing.  When John and

some of his buddies drove off, one of the other cars chased them and eventually pulled up on

John's side of the car and sprayed it with bullets from an automatic weapon.  John and the other

passenger hit the floor as their car swerved into a parking lot.  The driver of their car thought he

had been shot but the bullet that hit him had lost velocity after going through car and seat, and he

wasn't injured.  The car had 9 - 10 bullet holes in it.

John often hung out at the home of Daniel, a friend who was six or seven years older.

Daniel's house was at the end of a cul-de-sac, and three of Daniel's  brothers and some cousins

lived next door.   All of the residents on that street knew to flash their car lights twice when they

drove down the street at night as a signal that they were friendly.  They understood that if a car

came down the street without flashing its lights, Daniel and his brothers would all get guns and

"post up" anticipating that the people in the approaching car had guns and were about to do a drive-by.   Daniel's sisters and a brother who lived with him would sometimes forget, causing false alarms.  If a car approached without flashing its lights, Daniel would say, "hit the floor" and John and whoever else was there would fall behind couches and chairs, thinking that it might be someone intending to shoot up the house with Uzis and shotguns.  Eventually someone did shoot up the house.  Because of his age, John didn't have a gun, and he just ran in the house and hid.

The first drive-by that appeared to target John's house happened in 1993, in the afternoon before Juan Sr. got home from work.  John was inside and heard several gunshots, but when he went outside, he didn't see anything that had been hit, and whoever had fired the shots was gone.

In 1993-94, John started having recurring nightmares about people trying to kill him.  In his dreams, when he tried to defend himself he couldn't.  When he pulled the trigger, his gun wouldn't go off.   Or, he'd try to escape and he couldn't move.

### *More Gang Related Trauma & Betrayal*

One thing that ignites an unbearably painful and near-uncontrollable emotional reaction in John is the feeling and belief that someone important to him, in whom he has placed trust, has betrayed him.  When viewed in the context of John's life experiences, this reaction is best understood as a symptom of the effects of  repeated abandonment, betrayal and sometimes abuse by the people most important in his life and to whom he looked for protection combined with prolonged exposure to highly traumatic events such as witnessing and being the target of drive-by shootings at age 13, witnessing armed combat by gangs, beating and fights among fellow gang members, being the target of death threats and gang retaliation, and losing several good friends to

violent deaths.   For this reason, John's experiences during 1993 and 1994 are of particular importance.

The first betrayal John experienced after his mother left was a betrayal by his substitute family, the VCVs.  Despite the problems between John and Armando, John loved his brother, and stayed in touch with him after Armando left home.  Sometime in 1993-94, Armando gave John a red bandana.  VCV's colors were black and white.  Without thinking anything about it, John wore it because Armando gave it to him.  Members of VCV were upset over John wearing the red bandana, because red means Bloods and the Bloods are African American and a rival gang.

No one told him they had a problem with the red bandana.  One day John was sitting in Rushwood Park with one of his friends, wearing the bandana, when five or six cars of VCV gang members pulled up.  One of them asked John what he was doing, and when John told him that he was going to his friend's house to chill, they offered to give them a ride.  When they arrived at the friend's house, everyone got out, but no one said anything.  John felt uneasy, and said he was going home to get something to eat.  As he started to leave, a guy he didn't know, without a shirt on, started toward him with a black and white bandana wrapped around his fist.  John knew immediately they were supposed to fight, and he was right.  They fought until they were both worn out.

Afterwards, some of the VCV members took the red bandana and burned it right in front of John.  John was so mad, he started crying.  He felt betrayed by the VCVs and he wanted out of the gang, which meant he would have to be beaten up again, but this time by three or four gang

members – the ritual for leaving a gang.  With some help from Greg, John left the gang a short time later.

The VCVs tried to set John up at least two other times in 1994.  One of John's friends who was in VCV heard about a plan for some people to "hit" John.  He told John that they were going to get him drunk at his home, pretend to leave, but then come back, break-in and kill him. Determined to be tough, John decided he was going to set a trap them; he got a couple of guns and planned to sit in his bedroom chair with glasses on pretending to be asleep, with his hands in his pocket and a gun in each hand. As John had been told, the people came by John's house and partied for a while and then left.  After they left, John sat down in the bedroom waiting.  In a short while, John heard someone breaking in the door, and he got scared.  He jumped out his bedroom window and ran off.

In another incident, John barely escaped being attacked and perhaps killed by members of the VCV gang.  A faction in the gang wanted to take VCV over from Greg, and they planned a "hit" on him.  A group of VCV members had a plan to entice Greg over to where they were, and Greg fell for it.  A car load of guys from the same VCV faction found John and were going to pick him up and take him to the same place.  Not knowing anything about the plan, John was about to go with them when Armando showed up, and John went with him instead.  That same afternoon, John received a call from his sister who was crying and hysterical; she had heard about the planned "hit" and didn't know whether Greg was alright.  John later learned that Greg had been shot and stabbed, but he lived.  After being nearly killed and with the help and support of his family, Greg was able to leave Houston for a period of time and break away from the gang

and its pattern of violence and retaliation.

These incidents represent only a few examples of the violence that was almost a daily occurrence in John's life when he was only 13 and 14 years old.  Most of the other people involved were much older.

### *1994:  More Trauma*

Two of the most traumatic events in John's life happened in 1994, when he was 14 years old.  One night in August, John and four others were riding around.   John was in the back seat with Ronald Rozelle and Eric Schaeffer, both of whom were about John's age.  Johnnie Bernal, who was almost 18 years old, was in the front passenger's seat and Pedro Sanchez, who was several years older, was driving.  A short time before, they all had been sniffing paint.   At one point, Sanchez turned the car into the parking lot of an ice house and pulled up next to a group of young  people who were standing together talking – three young men and a young women.  Bernal pointed a gun through the front passenger window and demanded money.  The woman ran, and Johnnie told them that the next one who ran would be killed.  One of the young men turned and ran, and Bernal started firing his gun, hitting another young man twice and killing him.

Sanchez immediately drove off.  He first drove to Rozelle's house and let him out after he and Bernal told him them all that they would kill anyone who told what had happened.  Sanchez then drove to some apartments, and Bernal said he wanted to go to a wooded area near the bayou to shoot the gun.  John and Shaeffer overheard Bernal and Sanchez talking about not leaving any witnesses, and as they were walking in the woods, John and Shaeffer became fearful that they

were about to be shot, and they dropped behind and then turned and ran.  After emerging from the wooded area, they saw an officer at a nearby service station and told him someone was trying to kill them, and they needed a ride.  The officer gave them some change and told them to call a taxi.  John and Rozelle later testified as state witnesses at Bernal's capital murder trial.  Bernal was sentenced to death.

Word quickly got around that John had "snitched" on Bernal.  In retaliation, threats were made against John and his family.  There were also rumors of numerous "hits" out for John.  Because of the "snitch jacket," John has felt like he "had to watch his back" ever since then.  TYC records show that John felt tremendous guilt over the fact that he put his family's safety at risk.

A couple of months later, John and Kash, John's very best friend his own age, were high on paint thinner and playing around with a loaded gun in Kash's bedroom.  They were each sitting on the side of twin beds facing each other, and John was holding the gun.  Kash reached across and grabbed the gun at the same time John was pulling the hammer back, and the gun went off, hitting Kash in the hip and groin.  Kash was conscious, but was bleeding profusely.  Kash's mom called 911 and both Kash and John first told the police that someone had come in, shot Kash and left.  When the police didn't believe them, John quickly told them the truth.  John and Kash remained best friends.  John was eventually referred to juvenile court for "deadly conduct."

Kash suffered serious injuries which left him unable to have children.  A couple of years later, while John was in TYC, Kash died in a car accident.  To this day, John feels responsible for

his death.  He is convinced the car wreck was intentional, and that Kash committed suicide in part because of how his injuries had messed up his life.

**Juvenile Offenses, Probation, Boot Camp & TYC: 1994-2000**

### *First Juvenile Referral*

John's first referral to juvenile court was based on an arrest on July 29, 1994.  In the Matter of Juan Jose Reynoso, Jr.  No 87969, 314th District Court, Harris County, Texas (filed August 30, 1994).  John was driving a stolen car when he saw a police officer behind him.  John immediately pulled into a drive way and jumped out of the car, after unsuccessfully trying to put it in park.  The car rolled backwards toward the patrol car.  John kept running, and the officer moved his car to avoid being hit.  The officer saw John carrying a handgun and also saw him throw it away.  He ran after him, yelled for him to stop, which John eventually did, raising both hands in the air.  John was later released to his father.  That referral was later amended to include the offense of "deadly conduct" for the accidental shooting of Kash.

John was arrested two other times in 1994: once with a group of teenagers (he was one of the youngest) on a complaint that they had been chasing someone and threatening to shoot him; and another time when the vehicle he was riding in was stopped, and the officer found a "whipping club" in the floor of the vehicle.

### *Juvenile Adjudication:  Boot Camp & TYC (1995-2000)*

On January 9, 1995, John was adjudicated to be delinquent and was placed on Serious Offender Supervision (SOS).  After violating probation, he was committed to the custody of Harris County Juvenile Probation Department for placement in the Delta Boot Camp.  Over the

next five and a half years, John went back and forth between being in a juvenile custodial setting and on probation.  On November 29, 2000, when he turned 21, he was discharged from the custody of TYC.   John's infractions during periods of probation and parole consisted of use of drugs, and failing to report which was often due to use of drugs.

The records of the Harris County Probation Department show that John had some initial adjustment problems in Boot Camp.  When he was first placed in detention in February 1995, he tried to hang himself, and during his weeks in Delta Boot Camp, he continued to have problems with anger.4  However, in the structured environment of Boot Camp and with frequent counseling and guidance he made progress, and his placement summary states that "[t]he last two months of the trainees time in Phase II were exemplary.  He became a role model to other trainees."  Harris County Probation Records, Placement Summary 10/1/95.

When he was released from Boot Camp, he initially made a successful effort to comply with the conditions of his probation, but soon returned to drugs.  His probation was revoked and the court transferred his custody to TYC, and he was placed in a facility at San Saba.

John's initial progress at San Saba was remarkable.  While John continued to have some difficulty with anger, he made real strides in developing control, and he had a positive attitude. By the end of his first year, he had made excellent progress by all reports.  Within the first six months, John was receiving very good evaluations, with statements like:  "I could not be more satisfied with the way he is conducting himself....  I have the highest expectations for Juan."

---

4 A psychological summary indicates that anger and anxiety were major factors in his use of drugs.  John reported to the psychologist that he smoked marijuana to calm himself down. He said he needed to smoke when he got "real, real mad," and that he would smoke everyday if he could. MHMR Authority of Harris County , Psychological Screening, 2/21/96.

Chronological Record (CR) 11/27/96.  He continued to receive excellent progress reviews throughout the remainder of the first year: "Discussed progress made and it is excellent.  Juan has been an excellent role model."  CR 2/6/97.  "Juan has prepared some excellent interviews ... his thinking is very mature for his years....  Juan has been an excellent role model."  CR 2/06/97. "Juan also has completed his G.E.D....  Juan seems to have done a good job in the program and he has no security referrals in his file."  CR 3/4/97.   "Juan was recently staffed and retained on phase V, and is doing an excellent job working the program."  CR 3/6/97.  "Complemented Juan on his excellent ICP."   CR 3/12/97.

As John was approaching his exit interview, plans were being made for his release.  His probation officer was notified of his progress, and Juan began making plans to return home. Unexpectedly on March 21, 1997, Juan failed his pre-exit interview.  According to John, the counselor told him that he had failed his offense segment of his interview because he had referred to Kash as his "victim" instead of using his name, which showed a lack of remorse. John was devastated and so angry that he went back to his room and cried.  Kash was his best friend, and he felt tremendous guilt and remorse over what had happened.  John reacted angrily to being told he did not have remorse over the shooting.   John asked to be placed back at the first level, and for a time, he completely stopped trying to "work the program."  John's difficulty in coping with his loss was identified as an "authority" problem.  CR 5/16/97.

At one point a counselor told him that they were simply testing and playing around with him when they said he didn't have remorse about shooting Kash.  By then, John had totally lost faith in the program as well as his motivation.  His refusal to "work the program" continued for

several months.  Gradually John became engaged again, and his reviews for the last six months matched those of the first year.   He was release on parole in May 1998.

During his time at San Saba, he suffered additional losses.  Five of his friends died:  Kash was killed in a car accident; his next best friend, Billy, was killed when someone shot his head off with a shotgun; Eric was killed in a shoot-out; Darrel killed himself; and T-Rock was killed in a car wreck.  John felt guilty about both Kash's and Billy's deaths.  Billy was heavily into drugs, and John had been writing him, encouraging him to change his way of living.  John thought that if he had been released sooner, he might have been able to help Billy change the direction of his life.

On parole, John did really well for about eight months.  He went to church, stayed out of trouble and away from his former gang friends, and he got a job where his father worked.  He was also managing to avoid drugs, and he was thinking about taking some college courses. Then one day, his boss unexpectedly "went off" and yelled at him for using a particular machine, claiming that only certain people with special training were allowed to use it.  To John, this came out of nowhere.  He had been there several months, had used the machine before, and no one had told him not to use it.  John left work and didn't go back for a week, waiting until he calmed down.  When he returned, his boss told him, he didn't work there anymore.

John never really recovered from this incident.  He looked for another job, but did not find one.  Without a job, he was home all of the time and his old friends started coming over after his dad left for work and hanging out all day.  He started drinking and smoking marijuana, and once he was back on drugs, things went downhill fast.  For several months, John intermittently

reported to his probation officer, but as his drug use increased, his reporting decreased out of fear of being drug tested.  Anticipating a parole revocation increased John's anxiety and consequently his drug use.

In the fall of 1999, John learned that his former girlfriend, Linda, was pregnant, and about the same time, he heard that his current girlfriend had been talking about him behind his back. High on drugs, he confronted her with it, and they had a big fight.  She drove off, throwing out of the car window a CD of him rapping.  John felt like things were closing in on him.  He also didn't want to go back to TYC, and he didn't see any way to avoid it.  John was high, angry, depressed and full of hopelessness.  He speeded onto an overpass and sharply turned his car into the railing and went over the side.  An ambulance took him to a hospital, but when he got there, he refused to go inside and just walked off.  He was upset that he wasn't dead.

In May 2000, his parole was revoked and he was sent to TYC's Cook County juvenile facility where he stayed for about 2 months before being released on parole.  On November 2, 2000,  John turned 21 and was automatically discharged from TYC custody and probation.

## Drugs, Suicide, and Depression  – 1993-2000

Drugs and suicide are included under the same category because both were ways in which John attempted to cope with the ever present states of depression, fear, anxiety, paranoia anger and hopelessness he had experienced since the age of 13.

John first started smoking marijuana and sniffing paint at 13 after his mother left.  He and some of his friends had a "hang-out" spot in the weeds where they had a couch; they went there a lot to sniff paint.  Both paint sniffing and marijuana eased the pain and anger John felt over his

mother's abandonment of him and his siblings.  But the loss of his mother was a low hanging

cloud in John's life that was still there when the effects of the drugs wore off.  He was angry at

her, and didn't want to talk to her, but he also wanted her to come back home.  When she picked

up the girls, he wanted her take him too.  When he was high, he felt better; he wasn't so sad or

angry, but the relief was temporary.  The Harris County and TYC records contain numerous

references to John's depression, his efforts to combat it with drugs, and his suicidal thoughts and

attempts.

John's gang membership also filled a need related to his mother's absence – it gave him a

sense of belonging and an identity within a new family he thought he could count on.  At the

same time, it produced enormous fear and anxiety, emotions that John was not equipped to cope

with at a vulnerable stage in his emotional and psychological development.  Fear and anxiety

were also were emotions John had to overcome or hide in order to maintain a macho persona for

the gang.  To cope, John increased his marijuana and paint sniffing, and he added PCP

(phencyclidine) to the mix.  PCP made him feel strong and invulnerable, a well-recognized effect

of the drug.  It made him feel like superman, which seemed to be quite a gift in his

circumstances.   But again they were only temporary fixes; nothing cured the depression and

hopelessness that pervaded his life.

Almost everyone who knew John heard him talk about suicide at one time or another and

knew of incidents where he either tried to kill himself or was so despairing of life that he didn't

care whether he lived and engaged in life threatening behavior.  In addition to driving off an

overpass, he once stabbed himself in the chest, attempted to hang himself while he as at TYC,

attempted to overdose on PCP, and drank a whole bottle of vodka and was hospitalized for alcohol poisoning.  Once he had a huge quantity of Xanax when he was arrested, and he took them and was hospitalized for an overdose.  More than once, John put a gun to his dead, and thought of pulling the trigger.

## Psychological Deterioration:  2001-2003

When John was released from the Cook County juvenile facility, he returned to his dad's home and went to work for his uncles at Nice Auto.  John's ability to adjust was severely compromised as a result of his experiences in his early childhood and adolescence.  He continued to suffer from depression, feelings of hopelessness, suicidal thoughts, anxiety and paranoia, and the ever present rage just beneath the surface.  Finding a good job was difficult in part due to his "gang" appearance created by his tattoos and getting along with anyone was difficult because of his mental state.

In 2001, John met Marisol, and he fell in love "like he'd never been in love before."  At the same time, he felt like she disrespected him, and he took it because he loved her so much. Once he showed up at her job to bring her flower and a card and she "went off" on him and accused him of stalking her.  John was hurt.  He wasn't trying to stalk her; he was trying to be romantic.

John's relationship with Marisol created problems between him and Linda, his children's mother.  Linda was jealous of Marisol, and she let that be known.  Once she got into a fight with Marisol and she also fought with John.

During the same time, some of John's old gang adversaries resurfaced.  One of them was

a guy who had a run-in with John 10 years earlier, and he was still carrying a grudge.  John kept running into him, and when he did, there would be an incident between them.  John received new threats from people who were still intent on retaliating against him for his testimony against Bernal.

John was also having problems with his Dad and his younger sister, Angela, who was still living at home.  John and his friends were getting together regularly at John's house to rap.  Angela didn't like it and on one occasion, she called the police.  Juan Sr. took Angela's side against John.

By 2002, the violence had escalated.  John was beaten up several times in 2001 and 2002 by guys who held grudges from the old days.  One afternoon in 2002, about 10 guys, including the former gang rival from 10 years ago, came to John's house and jumped on him while one of them held a shotgun on John.  The next night, the former gang rival did a drive-by at John's house.  John's room was in the back of the house.  Sometime after midnight, he heard gunshots, and his dad told him to get on floor.  Bullet holes were in the door, window, and walls.  He picked up shells and they were 9 mm.  John's chronic anxiety grew into a serious panic disorder, and his limited ability to cope with stress became almost non-existent.  When confronted with any stressful situation, John would feel extreme anxiety that often grew into a full blown panic attack where his hands would visibly shake.  The only thing that helped was Xanax, and John was taking increasing amounts and drinking along with it.

John did not think he could trust anyone and felt like he was being betrayed by everyone who was close to him.  His feelings of stress, betrayal and paranoia were reinforced by real

problems in his current relationships.  By this time, John had two children by Linda.  He had

been babysitting with his daughter on a regular basis, and the time he spent with her was the most

valuable and meaningful time in his life.  However, he and Linda had been having problems.  In

late 2002, they got into a huge argument, and Linda ended up cutting John in the face.  After that,

she stopped letting John see his children.

John was also having problems in his relationship with Marisol.  Her parents disapproved

of John because of his tattoos, and she knew that he would never fit into her life.  John's strained

relationship with his Dad and Angela was even more strained after the drive-by shooting.  By the

end of 2002, John was high all of the time.  In early 2003, John moved out of his dad's house,

and stayed with his cousin Debbie for a while.  He was taking more and more Xanax daily and

lots of drinking beer and alcohol.  On Xanax, nothing mattered, he didn't care what happened to

him.  It controlled his panic attacks, but it did not take away his anger.  It just made him feel

invincible.

As messed up as he was, he was still holding on to his relationship with Marisol, and in

early February 2003, he had her name tattooed on his arm.  The next day a friend told John he'd

seen Marisol at club dancing with another guy.  John confronted her and she denied it.  He didn't

believe her.  They had a big fight and that same night, he went to his tattoo parlor and had a gun

tattooed over her name.  John felt everything slipping away; he didn't care about anything in his

life; he wanted to die, but he had made a promise when his children were born that he wouldn't

kill himself.  Instead, he just took more pills.  The robberies began that day at the car wash across

from the tattoo parlor.

**<u>Psychological Effects of</u>**
**<u>John's Childhood and Their Symptoms</u>**

### *Multiple Abandonment and Deaths*

When children and adolescents are exposed to multiple abandonments and deaths of key attachment figures in their lives, they predictably suffer profound experiences of grief and loss. Children cannot work through and manage the experience of grief without considerable help from trusted adult caretakers.  When such help is not available, grief can turn into deep, underlying depression and forever change children's perceptions of their own safety, the safety of others, and their sense of potential danger from the world around them.  Children can develop extremely negative and pessimistic schemas or maps of the world and views of their own and others' mortality.  Further, when loss is compounded by a sense of guilt, as was undoubtedly true for John following the accidental shooting of his best friend and his perception that his friend committed suicide because of the shooting, the process of bereavement is enormously complicated and the healing process severely compromised.

### *Repeated Exposure to Trauma*

When children are exposed to trauma, particularly when that exposure is chronic and involves multiple forms of exposure (e.g. in the home and in the community) they often experience long term physiological changes in the reactivity of their nervous systems.  These changes are best understood as a classic response to trauma that results in the chronic perception and expectation of danger, and is reflected in heightened autonomic states of readiness and hyperarousal.  John's school and juvenile records include multiple references to symptoms consistent with increased autonomic hyperreactivity and the perception of the world and others as

dangerous, including John's quickness to perceive betrayal, his distrust and difficulty with authority figures, and his extreme reactivity to perceived threat.

### *Foreshortened Sense of Future*

Children who are repeatedly exposed to violence, attachment disruption, abandonment, chaos and neglect often suffer profound impairments in their ability to trust others, view their future with optimism, and develop a positive view of their future and place in the world. From the perspective of psychological trauma, this is a symptom described in the DSM-IV-TR as "a foreshortened sense of future." A tragic, literally textbook example of this symptom is the tattoos on John's eyelids, which signify his preoccupation with his death and his profound sense of distrust and alienation from the social world in which he lives. The tattoo on the right eyelid says "Fuck you now," and the one on the left says, "Fuck you forever." When John got the tattoos, he thought he would likely be killed at an early age and that was what he wanted the "hypocrites" who came to his funeral to see when they viewed his body. Many of the other tattoos are equally reflective of the John's distrust of and alienation from the world around him which stems from his experiences in his early childhood and adolescence.

### Signs of Organicity and Neurological Involvment

In addition to mental and psychological disorders flowing from John's childhood issues and exposure to trauma, he exhibited numerous symptoms suggesting the involvement of brain and neurological damage. His father witnessed seizure-like activity after John's car wreck. John experienced (and his friends witnessed) numerous blackouts where he did not remember how he gotten to places or things he had done. The tremors associated with his panic attacks would be

the product of neurological damage.

**Academic Records**

       Academic underachievement is a classic response to childhood exposure to trauma and maltreatment.  John's school records suggest a significant discrepancy between his intellectual capacity and his academic performance.  Child maltreatment has been associated with neurological impairment and deficits in children's ability to concentrate and persist in problem solving, which can then subsequently impair the ability to function adequately in the school setting.  John's academic records suggest a pattern consistent with what is seen in maltreated and abused children.  Augoustinos, M., Developmental effects of child abuse: Recent findings. Child Abuse and Neglect, 11, pp. 15-27 (1987); Salziner, S., Feldman, R.S., Hammer, M. & Rasario, M., Risk for physical child abuse and the person consequences for its victims, Criminal Justice and Behavior, 18,  pp. (64—81) (1991).  His academic records also raise the question of whether he suffered from a significant learning disability.  Learning disabilities, when undiagnosed and unaddressed, often place children on a destructive developmental trajectory associated with school failure and drop-out, under or un-employment, and involvement in gang or other activities that decrease opportunities for healthy adulthood.

### *But for Counsel's Deficient Performance There is*
### *A Reasonable Probability That Reynoso Would*
### *Have Been Sentenced to Life Instead of Death*

       In the sentencing phase, the prosecution introduced Reynoso's juvenile records, interspersed with testimony about his extraneous offenses before and after the murder.  Lead by the prosecutor, witnesses who testified from the records presented a one-sided view of Reynoso's

performance and discipline record while in Boot Camp and TYC.  The records also contained an abundance of evidence that Reynoso worked very hard to improve his behavior and that he was successful and received much praise from his counselors for significant periods of time. Because trial counsel were not familiar with the records, they did nothing to call this information to the jury's attention.  One prosecution witness effectively misrepresented Reynoso's disciplinary record while in TYC custody by discussing only portions of the records.   Because trial counsel were not familiar with the records, they did nothing to correct this testimony. Although the records contained much inadmissible hearsay, defense counsel made no objections to their introduction.

If counsel had been familiar with the records, they could have shown numerous instances where they discussed Reynoso's history of depression, suicidal thoughts and attempts, and his use of drugs to deal with his anger and distress. If they had interviewed the counselors and probation officers, they could have presented evidence of Reynoso's difficult struggle to improve and overcome his anger problems.

During the defense's penalty phase presentation, Reynoso's jury heard a disjointed, non-contextual description of his life and a superficial explanation of his problems.  Having very little information themselves, trial counsel presented evidence that suggested Reynoso was raised in a middle class home where everyone was happy and everything was okay until his mother left when he was 13 years old.  After she left, Reynoso's school work suffered, he was depressed and used drugs.  Except when he was on drugs, he was a loving, caring person, who missed his mother, and he would not have done all of these terrible things had she not abandoned him.

While this explanation contains kernels of truth, it leaves out most of critical pieces of Reynoso's life that provide insight and understanding and engender compassion and empathy.

Contrary to the picture painted by the trial evidence, things were never okay.  As a small boy, Reynoso lived in a very poor neighborhood where he was exposed to violence and drugs and deprivation, and was surrounded by relatives who were always drinking and fighting.  In his own home, Reynoso was physically abused by an older brother at a young age, his parents were often angry and constantly fighting, and they showed no affection for each other.  In this unstable and frightening environment, Reynoso saw his mother as the only safe haven, which explains why her departure was so devastating.  By the vulnerable age of 13, he was in a home where the only remaining adult, his father, was physically absent most of the time and emotionally absent all of the time.  These are the classic circumstances that drive adolescents needing a substitute family into gangs.  Unfortunately for Reynoso, his sister's older boyfriend provided an easy entrée into gangs at the early age of 13, and he was quickly thrust into the world of gang violence usually reserved for older teenagers.  Over the next two years, Reynoso was exposed to repeated episodes of violence where his and other's lives were threatened.  Instead of providing a substitute for his mother, the gang environment increased exponentially the pain, terror, and isolation that he felt. Through drugs, he found a temporary respite, but nothing could prevent the toll on his psyche. Thus, at the tender age of 13, Reynoso was thrust into the impenetrable cycle of  violence, trauma and terror which inevitably leads to  depression,  anger, and isolation, which lead to drugs, suicidal behavior, and risk taking, which leads to more dangers and violence and trauma, and more drugs and more anger.

The mental illness that grew out of this toxic mix was predictable and virtually inevitable. By the time he killed Ms. Reidel, John lived his life as if his own death were imminent and inevitable, with no sense of hope, with a huge reservoir of anger that burst through his weakened constraints with the slightest provocation, careening from one moment to the next debilitated by drugs and the immeasurable psychological pain that had become unbearable.

Had the jury in John's trial been presented with this evidence, they would have been moved to spare his life. They would have understood that the proper response to tragedy of Ms. Reidel's life and death was not to put an end to John Reynoso's life, but to spare his life – because the building wave of torment and pain that he suffered from one phase of his young life to the next had finally become a tidal wave that overtook him as surely as the tidal waves overtook the coastal areas of south Asia several years ago. In sum, had the defense provided reasonably effective assistance, there is a reasonable probability that the jury verdict would have lead to a life sentence. *Strickland v. Washington*, 466 U.S. at 694. As the Supreme Court explained, the reasonable probability test of prejudice is met when un-presented evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). There can be no question that the presentation of John Reynoso's life in the manner set forth in this petition would have "put the whole case in such a different light" that this Court can have no confidence in the death verdict.

### *State Court Proceedings*

This claim was not raised in the initial state habeas application. Because of circumstances unique to this case, the state court post-conviction proceeding was inadequate and

ineffective to protect Reynoso's rights.  Thus, if there are no other available state court remedies,

exhaustion is excused under 28 U.S.C. § 2254(b)(1)(B)(ii).   However, petitioner believes that

there is an available state court remedy and that this Court should hold these federal habeas

proceeding in abeyance while he seeks relief in state court.  *Rhines v. Weber*, 544 U.S. 269

(2005).  In the event the state court determines that no state court remedy is available, petitioner

will present further evidence and argument as to why the state court process is inadequate.

## PRAYER FOR RELIEF

WHEREFORE, REYNOSO prays that this Court:

    1.   Issue a writ of habeas corpus that he may be discharged from his unconstitutional

sentence of death; and

    2.   Grant such other relief as law and justice require.

                                  Respectfully submitted,

                                  /S/ Edward A. Mallett

                                _____

                                EDWARD A. MALLETT
                                State bar No. 12863000
                                Federal ID No. 442
                                MALLETT & SAPER, L.L.P.
                                600 Travis Street, Suite 1900
                                Houston, Texas 77002
                                Tel: (713) 236-1900
                                Fax: (713) 228-0321

                                Counsel for Petitioner, Juan Jose Reynoso

## **<u>VERIFICATION</u>**

Upon information and belief and under penalty of perjury, I declare that the factual

allegations made in this petition are true and accurate.


Dated:____July 2, 2009_____

/S/ Edward A. Mallett
_____
EDWARD A. MALLETT

## **CERTIFICATE OF SERVICE**

I, EDWARD A. MALLETT, certify that the foregoing petition was served on the

Attorney General for the State of Texas, Counsel for Respondent, by electronic filing on this 2nd

day of July, 2009.

Ms. Fredericka S. Sargent
Texas Assistant Attorney General
Fredericka.Sargent@oag.state.tx.us

Ms. Laura Grant Berins
Texas Assistant Attorney General
Laura.Berins@oag.state.tx.us

/S/ Edward A. Mallett
_____
EDWARD A MALLETT