IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JUAN JOSE REYNOSO, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 4:09-CV-02103 |
| | § | (Death penalty case) |
| RICK THALER, Director, Texas | § | (Dist. Judge Lynn N. Hughes) |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**RESPONDENT THALER'S MOTION FOR SUMMARY JUDGMENT
AND ANSWER WITH BRIEF IN SUPPORT**

In a Texas state court, Juan Jose Reynoso,[1] Jr., was convicted of capital murder and sentenced to die for the robbery-related death of Tonya Riedel. Reynoso challenges his conviction and sentence by means of a petition for writ of habeas corpus. The Court has jurisdiction over the subject matter and the parties. *See* 28 U.S.C. § 2254 (West 2011). The Director through his attorney, the Attorney General of Texas, files this response. Except for those allegations supported by the record and those admitted herein, the Director denies every allegation of fact made by Reynoso. Photocopies of the state court records of Reynoso's appeal and state writ application have been sent to the Court.

---

[1]   In state-court records, the petitioner's surname is sometimes given as "Reynosa."

## REYNOSO'S ALLEGATIONS

Reynoso raises the following grounds for relief:

I.  He received ineffective assistance when counsel at sentencing failed to investigate and present certain mitigating evidence (Am. Pet'n For Writ of Habeas Corpus by a Person Sentenced to Death (Am. Pet'n) at 18–60 (Claim for Relief Number One); ECF[2] No. 20);

II.  The Texas death penalty system is unconstitutional because the mitigation issue does not assign a burden of proof (Am. Pet'n at 62–65 (Claim for Relief Number Two));

III.  The Texas death penalty system is unconstitutional because in connection with the mitigation special issue, it does not permit appellate review of the legal or factual sufficiency of the evidence (Am. Pet'n at 65–67 (Claim for Relief Number Three)); and

IV.  The Texas death penalty system is unconstitutional because the term "probability" in the future-dangerousness issue dilutes the "beyond a reasonable doubt" standard impermissibly (Am. Pet'n at 67–70 (Claim for Relief Number Four)).

## EXHAUSTION

Reynoso either has presented his claims to state court for review or is barred from now doing so. *See Nobles v. Johnson*, 127 F.3d 409, 422 (5th Cir. 1997). Because he has no additional state remedy available, Reynoso has exhausted his state-court remedies. *See Teague v. Lane*, 489 U.S. 288, 297–98 (1989). The Director does not move to dismiss these claims for failure to exhaust those remedies.

---

[2] "ECF" refers to the documents filed in the district court's electronic case filing system, followed by the document number and, where appropriate, the page number.

## STATEMENT OF THE CASE

Reynoso was found guilty of robbery-related capital murder with a deadly weapon and was sentenced to death. *State v. Reynoso*, No. 941,651 (263d Dist. Ct., Harris County, Tex. May 12, 2004) (2 CR[3] 371–72.) His conviction and sentence were affirmed on appeal, *Reynoso v. State,* No. AP-74,952, 2005 Tex. Crim. App. Unpub. LEXIS 50 (Dec. 14, 2005), and he sought no certiorari review. The Court of Criminal Appeals initially dismissed his application for habeas corpus relief, *Ex parte Reynoso*, 228 S.W.3d 163 (2008), but then on its own motion reconsidered, *Ex parte Reynoso*, No. WR-66,260-01, 2007 Tex. Crim. App. Unpub. LEXIS 473 (Sept. 12, 2007); *see* Tex. R. App. P. 79.2(d), and denied relief, *Ex parte Reynoso*, 257 S.W.3d 715 (2008). After Reynoso filed his federal petition (Pet'n for Writ of Habeas Corpus by a Person Sentenced to Death (Pet'n); ECF No. 1), this Court stayed proceedings to allow him to return to state court to present hitherto unpresented claims (ECF No. 7). The Court of Criminal Appeals dismissed his second application as abusive. *Ex parte Reynoso*, No. WR-66,260-02, 2010 Tex. Crim. App. Unpub. LEXIS 378 (June 16, 2010). Reynoso now returns to this Court. (Am. Pet'n; ECF No. 20.)

---

[3] "CR" refers to the clerk's record of papers filed in the trial court preceded by the volume number and followed by the page number.

## STATEMENT OF FACTS

### I.    During an Armed Robbery, Reynoso Shot a Homeless Woman Because She Had No Money to Hand Over.

At about 8 o'clock on the evening of March 2, 2003, friends George Jiminez and Tonya Riedel were at a convenience store in the Heights neighborhood of Houston. (12 RR[4] 48, 92, 93.) Jiminez was a day laborer who rented a room in the area, and Riedel, whom Jiminez knew as "Shadow," was homeless. (12 RR 89–90.) Riedel, forty-four years old at the time, was the mother of four. (13 RR 55–56.) Although at one time she had been a file clerk for an oil company, she had developed an addiction to drugs and alcohol and had lost her home and custody of her children. (13 RR 56.) Riedel told Jiminez she was hungry, so he bought her a bottle of wine and some ravioli, which she heated in the store's microwave and began eating. (12 RR 92–93.) As the two left the store, a man, later identified as Reynoso, approached them, drew a gun, and demanded money. (12 RR 95.) Jiminez gave Reynoso his wallet, which contained $20. (12 RR 95.) Reynoso then turned to Riedel and began calling her "bitch" and "all kinds of names." (12 RR 97.) Jiminez said that Riedel told Reynoso, "I don't have—I don't have no money. Leave me alone. You know, she was, like screaming at him. You know, leave me alone, I don't have no money." Jiminez

---

[4]   "RR" refers to the reporter's record of the trial testimony, preceded with the volume number and followed by the page number.

said that Reynoso struck Riedel in the face, and "she fell sitting down." (12 RR 99–100.) Reynoso then shot her "in the heart." (12 RR 100.) A car drove up, Reynoso got in, and the car drove away. (12 RR 101–02.) Soon thereafter, Riedel died. (12 RR 49, 74.)

Later that night at about 10 or 11, Eugene Reyes, a police informer and a friend of Reynoso's, got a phone call from his friend. (12 RR 229.) Reynoso asked for ride. (12 RR 229.) After Reyes picked up Reynoso, his friend told him about the robbery. (12 RR 232.) Reyes said that Reynoso told him, "[H]e had tried to rob—rob a lady and said she didn't have no money. So he said he basically shot her in the head [sic] since he thought she was lying." (12 RR 232.) Reyes said that Reynoso told him that "she had went down to her knees and started pleading for her life, basically, saying please don't do it, don't do it." (12 RR 232.) Reyes said that Reynoso's attitude about the shooting was "[B]asically, he didn't care. It was like a joke." (12 RR 233.) Asked whether Reynoso was bragging, Reyes said, "Yes, because he brought it up a number of times." (12 RR 233.)

Frank Habisreitinger, a tattoo artist who previously had given Reynoso several tattoos, testified that on March 3, 2003, the day after the slaying, Reynoso came to his shop and asked for two teardrop tattoos. (12 RR 246–48.) The shop owner said that Reynoso told him that he wanted the tattoos because "he killed a motherfucker." (12 RR 248.)

On March 6, while riding in a car with the police informer Reyes and other individuals, Reynoso was stopped and arrested by Houston police. (12 RR 256–58.) Reynoso later gave an oral statement to police in which he acknowledged shooting Riedel. (19 RR SX[5] 25 at 9.) He told police that at the time of the shooting, "I was just drunk, high wasn't even thinking." (19 RR SX 25 at 25.) He said, "Cause I know if I was sober I wouldn't have done it. But I was fucked up you know what I'm saying." (19 RR SX 25 at 25.)

## II.    At Punishment Both Sides Presented Evidence.

### A.    Reynoso had a history of juvenile-justice run-ins; the murder was part of an armed-robbery spree.

At sentencing, the State introduced evidence that in the weeks leading up to the murder, Reynoso had gone on an armed-robbery spree. Jilliana Dawn Kennedy, a twenty-three year old student, testified that at about 11 p.m. February 8, 2003, she and a friend, Christa Prichard, were robbed by Reynoso at a car wash near Old Town Spring in Harris County. (13 RR 136–37.) They were approached by two men, one later identified as Reynoso. (13 RR 138–39.) She said that Reynoso asked her friend, Prichard, whether she had any change. (13 RR 138.) Prichard said no. (13 RR 138.) Kennedy testified, "He said, you ain't got a dollar. She said no." (13 RR 138.) Then, Kennedy said, "[h]e pulled out a

---

[5] "SX" refers to the numbered exhibits offered and admitted into evidence at trial by the State.

gun and cocked it and put it to [Prichard's] head and said, bitch, give me everything you got."(13 RR 138–39.)

Prichard testified that when Reynoso pulled the gun on her, she thought of her children. (13 RR 149.) When Reynoso told her to give him "everything you got," she said she did not have anything. (13 RR 150.) She testified that in the car she had her paycheck for $360. (13 RR 150.) Asked by the prosecutor how she felt about giving up her paycheck to a gunman, Prichard, the sole support for two small children, said, "It wasn't going to happen." (13 RR 150.) In the end, Reynoso and his wing-man left, taking Kennedy's purse but not Prichard's money. (13 RR 151–52.)

On February 8, 2003, at about 11:30 p.m. a gunman armed with a 9 millimeter handgun, later identified as Reynoso, robbed a convenience store near Airtex and Interstate 45 in north Harris County. (14 RR 89–94.)

That same night, after 11:30, Reynoso and others robbed a video rental store on West Rankin in north Harris County. (14 RR 114, 116–17.) The owner of the store said a gunman, later identified as Reynoso, entered the store and demanded money. (14 RR 116.) But when Reynoso racked the pistol to chamber a round, the owner thought the pistol jammed. (14 RR 117.) The owner then struck Reynoso's pistol hand with a computer keyboard, causing Reynoso to drop the gun. (14 RR 117.) Reynoso grabbed money from the register and fled. (14 RR

117.) The owner's wife chased Reynoso into the parking lot, where someone fired a gun at her. (14 RR 117.) The slug went through the store glass front and lodged in an interior door. (14 RR 117–18.)

Weeks later, at about 5 a.m. on March 1, 2003, David Sauseda and his wife were at an apartment complex on North Main Street in Houston to buy beer after hours. (14 RR 145–46.) When Sauseda returned to his Chevy Blazer after buying the beer at an apartment, two men pulled up in a vehicle behind his Blazer. (14 RR 148.) Sauseda heard a man say "give me your money" and before he could respond was shot in the right leg. (14 RR 149.) Sauseda fell to the ground, tried to get up, and then was shot in the left leg. (14 RR 151.) Sauceda testified, ". . . I threw my wallet[.] I said, don't [sic] have to shoot me any more. Here, take it all. Take it all. And I was just looking at him. And he was standing there like that, looking at me with the gun." The other robber approached Sauceda with a knife, put it to Sauceda's neck, and took Sauceda's jewelry, a silver chain and some rings. (14 RR 152.) Sauceda's wife, who during the robbery stayed in the Blazer, later identified the gunman as Reynoso. (14 RR 171.)

On March 2, 2003, at about 11 p.m., Reynoso robbed a convenience store in southeast Houston. (15 RR 21–22.) He entered the store, got a 24-ounce beer, approached the counter, drew a .45-caliber pistol and told the clerk, "[G]ive me

all your money or else I'll F-ing [sic] kill you." (15 RR 29.) The clerk, behind a glass partition, gave him some money, about $150, and Reynoso took off.

The next night, at about 8, March 3, 2003, Brenda Cortez and her husband were sitting in a car outside a relative's house near Interstate 45 and Beltway 8 in north Harris County. (14 RR 174–75.) She was seated in the driver's seat. Two men approached. (14 RR 177–78.) One of the men, later identified as Reynoso, asked her if she knew the location of a park. (14 RR 179.) When she said no, he told her "well, you need to get out of the car." (14 RR 179.) She said, "[H]e pulled out a gun and was pointing it at my head." (14 RR 179.) She testified that she "went hysterical." (14 RR 180.) She said her husband got out of the passenger's side and she slid over the front seat to get out of the passenger's side. (14 RR 181.) They waited beside the car, and Reynoso continued pointing the gun at the couple. (14 RR 181.) Cortez testified, "[The gunman] was pointing it [the gun] at my—he was pointing at my face. I was standing. I was, like, I was like, please, you know, I was asking him and I was, you know, please, don't shoot us. You know, we don't have anything. We're not doing anything wrong." (14 RR 182.) She said, "And [the gunman] kept getting [sic]—shut up. Shut up. I'm going to shoot you. Shut up." (14 RR 182.)

Reynoso told Cortez's husband to get on his knees and to empty his pockets. (14 RR 182–83.) Cortez testified, "We're like, we don't have anything.

Whatever you want, you can have from the house. You know we'll go to the house. You can have whatever you want." (14 RR 183.)

Reynoso took the keys to Cortez's car, and he and the other robber drove away. (14 RR 184.) Cortez said that although the car was later found, it had been torched. (14 RR 187.)

Robert Haynes, a neighbor of Reynoso's, testified about an incident that occurred on March 4, 2003. (14 RR 201.) At the time of trial, Haynes worked for a soft-drink bottling company. (14 RR 199.) But previously, he has sold marijuana. (14 RR 201.) Over the years, he had sold to Reynoso small quantifies, $10 and $20 bags. (14 RR 201.) About a week and a half before the incident, Haynes advanced Reynoso a pound of marijuana. (14 RR 202.) Reynoso was to sell the marijuana to a friend for $400 and repay Haynes. (14 RR 202.) Shortly after Haynes delivered the marijuana to his neighbor, Reynoso called Haynes and told him that he had been robbed and the marijuana had been stolen. (14 RR 203.) Haynes told Reynoso that the marijuana was his, that is, Reynoso's, and that Reynoso still owed the $400. (14 RR 203.) Reynoso told Haynes to meet him at a car wash about a half a mile from their houses and he would pay Haynes. (14 RR 205.) Haynes drove his truck to the car wash where he met Reynoso. (14 RR 208.) Reynoso got into the truck, pulled a .45 caliber pistol, and told Haynes

that he was going to kill him. (14 RR 209.) Reynoso put the gun to Haynes's head. (14 RR 211.)

Haynes said, "I looked over at him—because I didn't actually think that he was serious. By that time, I pushed the gun. And as soon as I pushed the gun—well, actually, I grabbed his hand. I didn't even get to touch the gun. I grabbed his hand." (14 RR 212.)

The gun went off in front of Haynes's face and the slug went through the driver's-side window. (14 RR 212.) They wrestled and both fell out of the passenger's-side door. (14 RR 212–13.) As they wrestled for the gun, the pistol fired again, this slug going through the passenger's seat. (14 RR 214.) Then another man jumped into the fight and tried to help Reynoso. (14 RR 215.) At that point, no one had the gun, which was on the ground, so Haynes fled on foot. (14 RR 215.) Reynoso and the other man took Haynes's truck and began chasing him. (14 RR 216.) Haynes ran across the parking lot of a nearby grocery store and across a busy street and flagged down a Harris County constable who happened to be driving by on patrol. (14 RR 217.) The constable called for backup and a radio alert was sent out to tell officers to look out for Reynoso and Haynes's truck. (14 RR 232, 241.) A warrant was issued for Reynoso's arrest, and some days later Haynes's truck was recovered. (14 RR 248–49.)

Asa Cruz, a friend of Reynoso's, testified about an incident that happened the night of the murder. (14 RR 270.) Eugene Reyes, Reynoso, and Cruz were driving around the Greenspoint area looking for a motel room for Reynoso. (14 RR 274–75.) They pulled up to a motel, and Cruz got out to ask the desk clerk about prices. (14 RR 275.) When Cruz told Reynoso the price, Reynoso thought the room was too expensive so he got out and went up to the front desk and pulled a pistol on the desk clerk. (14 RR 276.) The clerk was behind a glass partition. (14 RR 276.) Reynoso did not fire the gun. The men then left to go to a different motel. (14 RR276–78.)

The prosecutors introduced evidence that Reynoso's run-ins with the justice system had begun when he was a juvenile in December 1993 with a terroristic threat referral. (13 RR 95.) Later juvenile-justice referrals included allegations of unlawfully carrying a weapon, in August 1994, when he was fourteen; unauthorized use of a motor vehicle; and evading arrest. (13 RR 96–97). Reynoso was assigned to the Serious Offense Supervision Unit and later sent to Harris County Juvenile Probation Boot Camp. (13 RR 97–98, 103.) Later he was released to the custody of his father but was assigned to the weekend boot camp. (13 RR 105.) Reynoso failed to comply with the terms of this release by not maintaining contact with authorities and by failing a drug test. (13 RR 106.) When he was fifteen, he was sent to the Texas Youth Commission, the

state school for juvenile offenders. (13 RR 108–10.) His records there showed ten incidents involving either self-referrals or substantial program disruptions. (14 RR 12–13.) After release on parole, he absconded from that parole. (14 RR 26.)

As an adult, he was convicted of burglary of a vehicle, twice; possession of marijuana; possession of a controlled substance; and contempt of court, all misdemeanors. (13 RR 164–65.)

A Houston police officer testified that in July 1994, he effected a traffic stop in connection with a stolen car. (14 RR 57–58.) After the car stopped, the passenger and the driver, later identified as Reynoso, fled on foot. (14 RR 59.) The officer chased Reynoso on foot and saw Reynoso draw a 9 millimeter handgun. (14 RR 61.) Reynoso finally complied with the officer's orders to stop and was arrested. (14 RR 64–65.)

A Harris County jailer testified that while awaiting trial, Reynoso had assaulted another inmate. (14 RR 73–74.)

### B.    Reynoso offered evidence of good character, childhood difficulties, abandonment by his mother, and drug use.

On his son's behalf, Reynoso's father said that when his son was thirteen, his wife, Reynoso's mother, abandoned the family. (15 RR 95–96.) Reynoso's father, Juan Reynoso, Sr., who painted cars for a living, said he and his wife divorced because she was using cocaine. (15 RR 93.) It was when his mother left, that Reynoso began to misbehave. (15 RR 96.) Although Reynoso remained good

at school sports, his grades began to suffer. (15 RR 96–97.) When his son was thirteen, he began using illegal drugs, marijuana, and sniffing glue. (15 RR 101–02.) Then when he was nineteen, he first attempted suicide. (15 RR 102–03.) When he was twenty, Reynoso was involved in a car accident. (15 RR 99.) "He began to have something bad in his mind," his father said.  (15 RR 99.) His son began to have seizures and was treated for depression. (15 RR 99–100.)

Juanita Bustos, Reynoso's maternal grandmother, testified that after her daughter's divorce, Reynoso wanted his mother and father to get back together. (15 RR 125.) She said that Reynoso's father provided his children food and shelter but was not the "kind of nurturing type of father." (15 RR 129.) She said that her grandson loved his children. (15 RR 130–31.) She said that after Reynoso began getting into trouble, she tried to minister to him. (15 RR 133.) "I'm a born-again Christian," she said. (15 RR 133.) At one point, Reynoso planned to move to Corpus Christi to live with her. (15 RR 135.) She said, "He knows he did wrong. And from day one he's told me how sorry he is he did what he did. He repented, he knows God's going to forgive him." (15 RR 133–34.)

Stephanie Collar had known Reynoso since she was fourteen and was his former girlfriend. She said he had always been nice to her, had never been violent, and was kind to her pets. (15 RR 140, 143, 145–46.) He was unhappy at home, she said, and was unhappy that the mother of his children would not

allow him to see his kids. (15 RR 145–46.) She said that once he drove his car off the highway in a suicide attempt. (15 RR 152.)

Another former girlfriend, Aid [sic] Marisol Molina, said she still loved him. (15 RR 169.) He always had positive things to say, she said, always made her feel great, and was a caring and loving father. (15 RR 169.) His friends were a bad influence, she said. (15 RR 169–70.) She had never seen him with a gun and had never seen him use drugs, but acknowledged that her parents would not have liked him. (15 RR 174–75, 180–81.)

Ronald Ramos, a family friend, said that Reynoso's friends put him in a bad environment. (15 RR 199.) As for Reynoso's home life, Ramos said, his father was often absent and Reynoso's brother, Armando, picked on Reynoso and once beat him up. (15 RR 201.) Ramos had seen Reynoso under the influence of drugs and alcohol. (15 RR 204.)

Dr. Dong Soo Kim testified that he had treated Reynoso for anxiety and had prescribed Xanax. (15 RR 213–14.)

Isabel Perez, Reynoso's cousin, testified that when he was young, Reynoso was "very nice," that he was "very confident about himself, very sure," that he always stood up for the underdog, and that he was "very polite, very respectful, very well-mannered." (15 RR 228, 231.) But after Reynoso started having problems at home, she said, he became withdrawn. (15 RR 231–32.)

The mother or Reynoso's children, Linda Robles, said although they lived together only four days, she had wanted to marry him. (16 RR 11.) He loved his children, would cook for them, and would teach them right from wrong. (16 RR 13.) But, she said, she did not like his friends. (16 RR 12.)

Reynoso's mother, Velma Jean Vella, testified on his behalf and disputed her ex-husband's allegations that she had used drugs. (16 RR 35.) She loved her children, she said, and felt guilt and remorse about leaving them. (16 RR 36.) Because of the deterioration of her marriage, though, "I just felt that, 'em, I needed to move on." (16 RR 36.) Her husband had not been involved in criminal activity, she said, but after she left, her son began having problems with minor delinquency. (16 RR 37–38.) Once, she said, after her husband slapped Reynoso, Child Protective Services were notified. (16 RR 43.) She said while he was growing up, her sone was caring, happy, athletic, and bright. (16 RR 44.) Her husband, while a good provider, was not caring or affectionate. (16 RR 44.)

Norma Jean Flores, Vella's sister and Reynoso's aunt, said that as a boy, her nephew was normal, active. (16 RR 67.) She said his father was a good provider but that she had seen him direct some physical abuse against Reynoso and Reynoso's older brother, Armando. (16 RR 69.)

Roxanne Flores Aguirre, Reynoso's half-sister, said that before his parents' separation, her brother was involved in baseball and a pitcher and "always got

praise from his coaches." (16 RR 75.) Before he was thirteen or fourteen, he was a normal boy. (16 RR 75.) But after their parents' divorce, her brother began misbehaving in school. (16 RR 77.) She said her step-father, Reynoso, Sr., was not involved with the children. (16 RR 79.) He would sit on the couch, drink beer, and watch television. (16 RR 79.) She described him as an alcoholic. (16 RR 81.) And, she said, her father was abusive to the children. (16 RR 84). She saw evidence that her brother, Reynoso, Jr., had started cutting himself. (16 RR 87.) She also had seen him abuse paint thinner. (16 RR 94–95.)

Kevin Robicheaux, a school friend of Reynoso's, said that his friend had used marijuana, paint thinner, and "fry," cigarettes soaked in embalming fluid. (16 RR 113–14.) He said that Reynoso had always been a good person but had made some mistakes. (16 RR 122.)

Reynoso testified and said that when he committed the murder he has been drinking and was abusing Xanax and did not remember his actions. (16 RR 162–63.) He said he did not remember the robbery of Brenda Cortez or the convenience-store robbery in southeast Houston. (16 RR 165–66.) He said his problems arose after he "[b]egan to associate myself with a delinquent group of people." (16 RR 168.) When he was in TYC and had no access to illegal drugs, he said, he did better. (16 RR 171–72.) Over the years, he said, he had used illegal drugs and substances, including marijuana, paint, "acid," embalming fluid mixed

with PCP, and cocaine. (16 RR 174–75.) He also abused the prescription medication Xanax. (16 RR 176.) He said that his family members physically abused him.  His father once slapped him across the face (16 RR 178) and his brother, Armando, and his cousins would beat him up (16 RR 178–79). He began working when he was sixteen, at a car wash (16 RR 180) and had held several legitimate jobs since. (16 RR 181–82.) He said he committed the crimes because he had been on drugs and that otherwise he was a normal, loving, caring person. (16 RR 192.)

## PROCEDURAL BACKGROUND

### I.    On Direct Review, the Conviction and Sentence Were Affirmed.

On state appeal, Reynoso complained that the trial court erred at sentencing by failing to admit into evidence certain child-welfare records collected in connection with Reynoso's brother, Armando. *Reynoso v. State*, No. AP-74,952 (Tex. Crim. App. Nov. 18, 2004) (Appellant's Am. Br. (Br.) at 17–21.) Reynoso raised complaints under state law and under the Eighth Amendment. (Br. at 17–21.) He also complained he received ineffective assistance at sentencing when counsel failed to object to the admission of hearsay evidence (*id.* at 22–25); the trial court erred by sustaining the prosecutor's objection to certain defense arguments at guilt-innocence (*id.* at 26–27); the mitigation question at sentencing was unconstitutional because it did not assign a burden of proof and

did not permit meaningful appellate review (*id.* at 28–50); and Article 37.071, § 2(2)(b)(1), of the Code of Criminal Procedure was unconstitutional (*id.* at 51–66). The Court of Criminal Appeals affirmed the conviction and the sentence. *Reynoso v. State*, 2005 Tex. Crim. App. Unpub. LEXIS 50.

## II.    The Court of Criminal Appeals Denied Postconviction Relief.

### A.    In his first state application Reynoso raised a claim previously rejected on appeal; the court declined to review the claim again.

In state habeas proceedings, Reynoso proved mercurial.  He would tell the court at times that he wish to forgo further review and then would reverse himself. After he was convicted and sentenced, Reynoso for several months thereafter stated that he wished to waive his appeals and wished to have the court set an execution date. *Ex parte Reynoso*, 257 S.W.3d at 717. On May 19, 2004, the convicting court appointed Stephen R. "Rocket" Rosen to represent Reynoso in state habeas proceedings. *In re Reynoso*, 161 S.W.3d 516, 516 (Tex. Crim. App. 2005). On September 15, 2004, the Court of Criminal Appeals abated proceedings and ordered the convicting court to conduct a hearing on the record to answer certain questions regarding Reynoso's decision to forgo further review. *Reynoso v. State*, No. 74,952 (Order) (unpublished).

On November 8, 2004, the convicting court held a hearing at which Reynoso repeated his desire to waive further review. (Nov. 8, 2004 RR[6] 7–8.) The convicting court withdrew its order appointing Rosen as habeas counsel. *Ex parte Reynoso*, 257 S.W.3d at 717. As required by statute, the appeal continued. *Id.*

On November 18, 2004, Reynoso's court-appointed counsel on appeal, Dick Wheelan, filed a brief. *Reynoso v. State*, No. 74,952 (Tex. Crim. App.) (Br. at cover, date stamp.) About ten days later, on November 28, 2004, the trial court received a letter from Reynoso asking the court to set an execution date. *Ex parte Reynoso*, 257 S.W.3d at 717. On February 8, 2005, the Court of Criminal Appeals received another such letter from Reynoso asking that an execution date be set. (Letter from Reynoso to Judge Sharon Keller (Nov. 29, 2004).) On February 23, 2005, the State filed its brief on appeal. *Ex parte Reynoso*, 257 S.W.3d at 717. On March 2, 2005, Reynoso in a letter to the convicting court said he had changed his mind and wished to pursue further review. *Id.* On April 4, the convicting court held a hearing in which Reynoso affirmed his desire to continue postconviction proceedings. The court reappointed Rosen to represent Reynoso. *Id.* at 718. On May 1, 2005, Reynoso wrote the convicting court stating

---

[6] "Nov. 8, 2004 RR" refers to the reporter's record of the testimony from the November 8, 2004 court hearing, followed by the page number.

that he had again changed his mind, that he did not wish to be represented by Rosen, that he wished to waive his further review, and that he wished the court to set an execution date immediately. *Id.*

On May 4, 2005, the Court of Criminal Appeals issued an order in which it held that it would consider the trial court's reappointment of Rosen as rescission of its earlier order allowing Rosen to withdraw. *In re Reynoso*, 161 S.W.3d 516. The court allowed the postconviction proceedings to continue. *Id.*

On May 19, 2005, attorney Sidney Crowley, who was assisting Rosen, visited Reynoso in prison. At that meeting, Reynoso told Crowley that he did not want a habeas application filed on his behalf. *Ex parte Reynoso*, 257 S.W.3d at 718. About a month later, on June 22, 2005, Reynoso wrote a letter to the convicting court asking it to disregard his most recent request to waive further review. *Id.*

On July 11, 2005, Rosen filed Reynoso's habeas corpus application. *Id.* (Dec. 20, 2006 SHCR[7] 2–14.) In that application Reynoso raised a single issue: The Texas death-penalty scheme deprived him of due process because it failed to place upon the State the burden of disproving sufficient mitigation. (*Id.* at 6.)

---

[7] "Dec. 20, 2006 SHCR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court in connection with Reynoso's first habeas application, No. WR-66,260-01, remanded to the trial court on December 20, 2006, followed by the page number.

On December 14, 2005, the Court of Criminal Appeals on direct review affirmed Reynoso's conviction and sentence. *Reynoso v. State*, 2005 Tex. Crim. App. Unpub. LEXIS 50.

On January 8, 2006, the State filed its response to Reynoso's habeas application. *Ex parte Reynoso*, 257 S.W.3d at 718. (Dec. 20, 2006 SHCR 23–41.) On October 11, 2006, the convicting court issued finding and conclusions and recommended that relief be denied. (Dec. 20, 2006 SHCR 53–60.)

On October 19, 2006, Reynoso filed an application in the convicting court for appointment of different habeas counsel. *Ex parte Reynoso*, 257 S.W.3d at 718. (Dec. 20, 2006 SHCR 50–52.) The application appears to have been filed October 12, 2006. (Dec. 20, 2006 SHCR 52.)

On December 20, 2006, the Court of Criminal Appeals remanded the matter to the convicting court with orders that the court resolve the issues raised in Reynoso's application for different counsel. *Ex parte Reynoso*, No. WR-66,260-01, 2006 Tex. Crim. App. Unpub. LEXIS 319.

The convicting court took evidence through affidavits. (June 27, 2007 SHCR[8] 11 (Crowley), 16–17 (Rosen), 22–30 (Mandy Welch), 46 (Tina Church).) It recommended that the pending application prepared by Rosen be withdrawn,

---

[8] "June 27, 2007 SHCR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court in connection with Reynoso's first habeas application, No. WR-66,260-01, dismissed on June 27, 2007, followed by the page number.

that the Court of Criminal Appeals authorize the convicting court to appoint new counsel, and that new counsel be given 180 days from the date of appointment to prepare a new application. (June 27, 2007 SHCR 48–54.)

The Court of Criminal Appeals determined, rather, that Reynoso's application was late and that because its tardiness was due to Reynoso's flip-flopping, he had not shown good cause. *Ex parte Reynoso*, 228 S.W.3d at 165–66. The court dismissed his application. *Id.* at 166.

Some months later, on September 12, 2007, the Court of Criminal Appeals decided on its own motion to reconsider the issue and asked for additional briefing. *Ex parte Reynoso*, WR-66,260-01, 2007 Tex. Crim. App. Unpub. LEXIS 473. On July 2, 2008, the court determined that Reynoso had, in fact, shown good cause for his tardy application and that the court would review the application on the merits. *Ex parte Reynoso*, 257 S.W.3d at 723. The court determined that because Reynoso's claim had been raised and rejected on appeal, it was not cognizable in habeas proceeding. *Id.* The court denied relief. *Id.*

### B.   On his first federal petition, this Court stayed proceeding to let Reynoso to return to state court to present new claims.

In his first federal habeas petition, Reynoso raised those claims listed above in the section headed "REYNOSO'S ALLEGATIONS." (Pet'n at 14, 17, 18, 22; ECF No. 1.) This Court granted Reynoso's motion to stay proceedings to

allow him to return to state court to present the ineffective-assistance claim, Claim I, which had not previously been presented to state courts. (ECF Nos. 7, 9 & 10.)

### C.   The state court dismissed the second state application as abusive.

In his second state application, Reynoso alleged that he received ineffective assistance at sentencing when counsel failed to offer certain mitigating evidence. (2 SHCR[9] 12–65.) To that application he appended much of that evidence presented to this Court, specifically, affidavits from Gina Vitale (2 SHCR 90–92), Roxanne Aguirre (2 SHCR 95–100), Velma Vella (2 SHCR 103–09), Juan Reynoso, Sr. (2 SHCR 111–16), and Greg Bean (2 SHCR 133–40), and reports from Drs. Jennings (2 SHCR 143–46) and Dudley (2 SHCR 149–54). The Court of Criminal Appeals determined that the allegations presented by Reynoso failed to meet the requirements of Article 11.071, § 5(a), of the Code of Criminal Procedure and dismissed the application as abusive. *Ex parte Reynoso*, No. WR-66,260-02, 2010 Tex. Crim. App. Unpub. LEXIS 378, at *2 (June 16, 2010) (Order).

---

[9] "2 SHCR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court in connection with Reynoso's second habeas application, No. WR-66,260-02, followed by the page number.

**D.    Reynoso now has returned to this Court.**

Reynoso has returned to this Court and filed the Amended Petition now being considered. (ECF No. 7.)

## STANDARD OF REVIEW

## I.    The Record Shows That the Director Is Entitled to Judgment.

A party moving for summary judgment bears the burden of informing the court of the basis for its motion and identifying pleadings and other record evidence that demonstrate the absence of any genuine issues of material fact. *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 191 (5th Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the moving party makes the required showing, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. *Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).  Here, the record developed in the state courts shows that the Director is entitled to judgment as a matter of law.

## II.    Where a Claim Was Adjudicated on the Merits in State Court, this Court Determines Only Whether That Decision Was Reasonable.

A federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the relevant constitutional claim by the state court, (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court; or (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent; or

-25-

(3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (quoting 28 U.S.C. § 2254(d) (West 2011)); *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *Id.* at 405–06.

A run-of-the-mill state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" standard. *Williams*, 529 U.S. at 406. To this end, a state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. To determine whether the state court's application was unreasonable, a federal court must determine what arguments or theories supported or could have supported the state court's decision and then must ask whether fairminded jurists could disagree that those arguments or theories were inconsistent with the holding in a prior decision of the Supreme Court. *Richter*, 131 S. Ct. at 786. Indeed, under the federal standard, this is the only question that matters. *Id.*

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664. This is particularly true when reviewing a state court's application of *Strickland v. Washington*, 466 U.S. 668 (1984), which when analyzed in conjunction with § 2254(d), creates a difficult-to-surmount, "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 786.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 131 S. Ct. at 786. If the federal standard is difficult to meet, that is because it was meant to be. *Id.* The federal standard does not prevent a court from relitigating a claim already rejected by the state court. *Id.* The federal court still may issue the writ where no fairminded jurist could disagree that the state court's decision conflicts with

Supreme Court precedents. *Id.* But the federal standard goes no farther. *Id.* The standard reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems" not a substitute for ordinary error correction through appeal. *Id.*

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Catalan v. Cockrell*, 315 F.3d 491, 493  (5th Cir. 2002) (". . . we review only the state court's decision, not its reasoning or written opinion . . .."). Indeed, state courts are presumed to know and follow the law. *Visciotti*, 537 U.S. at 24. Even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, the deferential standard of review nonetheless applies so long as neither the reasoning nor the result of the state-court decision contradicts Supreme Court precedent. *Richter*, 131 S. Ct. at 786; *Early v. Packer*, 537 U.S. 3, 8 (2002);

If the Supreme Court has not broken sufficient legal ground to establish a constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the federal bar under either the contrary-to or unreasonable-application standard. *Williams*, 529 U.S. at 381; *see* §2254(d). Stated differently, to gain relief, a prisoner must show that the state

court's ruling was so lacking in justification that there "was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786–87. And a federal court must be wary of circumstances in which it must extend the Supreme Court's legal rationale before the rationale can apply to the facts at hand. *Alvarado*, 541 U.S. at 666. Such a process suggests the proposed rule is not clearly established. *Id.*

AEDPA[10] also provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1). The presumption applies not only to explicit findings, but to those unarticulated findings needed for the state court's conclusions of mixed law and fact. *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

And except for the exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state-court fact finding must have been presented to the state court. Because a federal habeas court may not grant relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that

---

[10] Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104-132, 110 Stat. 1214 (1996).

demonstrating the incorrectness of a state-court fact-finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner. § 2254(d)(2).

### III. In Determining Whether the State Court's Decision Was Reasonable this Court May Consider Only That Evidence Before the State Court.

The Supreme Court has recently held that when a state court has adjudicated a claim on the merits and the federal court must determine whether that adjudication was reasonable, *see* § 2254(d)(1), the federal court must consider the state court's decision only in light of that evidence before the state court. *See Cullen v. Pinholster*, No. 09-1088, 2011 U.S. LEXIS 2616, at *21 (April 4, 2011). The review is limited to the record in existence at the time the state court made its decision, that is, the record before the state court. *See id.* In making its reasonableness determination under § 2254(d)(1), the federal court errs when it considers evidence developed in federal proceedings. *See id.*, 2011 U.S. LEXIS 2616, at *29.

### ANSWER

### I. On His Ineffective-Assistance Claim, Reynoso Is Entitled to No Relief.

Reynoso alleges that he received ineffective assistance at sentencing when counsel failed to investigate and present certain mitigating evidence. (Am. Pet'n at 18; ECF No. 20.)

A.    **The claim is defaulted.**

1.    **Reynoso never presented the claim to the state court in a procedurally correct fashion.**

Because the claim was not presented to the state courts in a manner that would assure a review on the merits and because he may not present the claim now, the claim is defaulted.

A federal habeas petitioner may not obtain relief unless he first exhausts his state-court remedies. *See* U.S.C. § 2254(b) (West 2011). He must give the state courts the first opportunity to address and if necessary correct deprivations of federal constitutional rights. *See Castille v. Peoples*, 489 U.S. 346, 349 (1989). Where he raises a claim in state court in a manner that is incorrect procedurally, he has not given the state courts a fair opportunity to address his claims and thus has not exhausted his claims. *See Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). A habeas petitioner must give the state courts a fair opportunity to review his claims, that is, in a procedural context in which the state courts will be certain to review his claims solely on the merits. *See Castille*, 489 U.S. at 351.

Under Texas law, if an applicant files a subsequent habeas application after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that (1) the current claims and issues have not been and could not have been presented previously in a timely initial

application or in a previously considered application because the factual or legal basis for the claim was unavailable when the applicant filed the previous application; (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor the sentencing-phase questions. Tex. Code Crim. Proc. art 11.071, § 5(a) (West 2011).

Reynoso did not present his ineffective-assistance claim to the state courts in a manner that would ensure the courts reviewed his claim on the merits. He did not include the claim in his initial application. (Dec. 20, 2006 SHCR 6.) Hence, when he included the claim in his second application, he was not entitled to merits review unless he met one of the statutory criteria (2 SHCR 12–65), that is, new facts or law, actual innocence of the crime charged, or actual innocence of the death penalty. *See* Article 11.071, § 5(a)(1), (2), & (3). In state court, Reynoso did not allege newly arising law or that he was innocent of the crime charged or was innocent of the death penalty. (2 SHCR 65–83.) Thus, the only ground upon which he would have been entitled to merits review would be an allegation of newly arising facts. *See* Article 11.071, § 5(a)(1). But under state law, for subsequent writ purposes, the factual basis of a claim is "unavailable on

or before the date" of the initial application where on or before the date on which the applicant filed his first application the factual basis was not ascertainable through the exercise of reasonable diligence.  Article 11.071, § 5(e).  Reynoso did not allege that the facts were not available. He argued rather that even though the facts were available, they were not presented in his first application due to his own "mental impairments" and counsel's "abdication of his statutory and professional responsibility." (2 SHCR 65–83.) The Director disagrees with Reynoso's contention that state habeas counsel's performance was substandard. But were the Court to take Reynoso's allegation at face value, the allegation does not describe a situation in which the factual basis of the claim would have avoided discovery despite the exercise of reasonable diligence. *See* Art. 11.071, § 5(e). Indeed, the allegation describes the opposite situation; that is, had Reynoso or counsel use reasonable diligence, the facts would have been discovered and could have been presented in the initial application.

As for Reynoso's "mental impairment" allegation, again, the allegation does not describe reasonable diligence. In fact, Reynoso does not describe a mental impairment influencing the state habeas process. Reynoso waffled during the state proceedings, at times wishing to proceed, at others, wishing to waive further review. His own indecision describes something other than reasonable diligence. He suggests that an as-yet-undescribed mental impairment prevented

-33-

him from presenting the factual basis earlier. Such a suggestion is convenient. To allow such an argument would invite petitioners to manipulate the system and avoid state review with the merest of excuse.

Reynoso never gave the state courts a fair opportunity to review his claim on the merits. He cannot do so now. The claim is defaulted.

### 2. The state court denied relief by relying upon a state-law ground independent of federal law.

The claim is defaulted also because the state court denied relief by relying upon a state-law default that was independent of federal law and was adequate to support the dismissal.

Where the last state court to consider the claim based its denial of relief on a state default expressly and unambiguously, federal review of the habeas claim is barred. *Harris v. Reed*, 489 U.S. 255, 161–62 (1989). Federal courts will not review a question of federal law where the state-court judgment relies upon a state-law ground that is independent of the federal question and is adequate to support the state-court judgment. *See Coleman v. Thompson*, 501 U.S. 722, 726 (1991). In determining whether the state-court judgment rests upon state or federal law, a federal court will presume that the state-court decision was based upon federal law where that decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of

the opinion." *Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983). The presumption must rest upon something other than the state court's silence. *Id.* "In some form, the state court has to make a fair indication that the merits of the claims were reached." *Balentine v. Thaler*, 626 F.3d 842, 854 (5th Cir. 2010).

In his second state application, Reynoso did not allege that he was innocent of the crime charged, *see* Art. 11.071, § 5(a)(2), or "innocent of the death penalty," *see* Art. 11.071, § 5(a)(3). Nor did he rely upon newly arising law. *See* Art. 11.071, § 5(a)(1). He alleged, rather, that even had reasonable diligence been exercised, the factual basis of the claim could not have been discovered previously. (2 SHCR 65–83.) A Texas court examines such a claim using a two-step process. *Rocha v. Thaler*, 626 F.3d 815, 833 (5th Cir. 2010). First, the court determines whether the factual basis of the claim could have been discovered through the exercise of reasonable diligence. *Id.* at 834. Only after the applicant leaps this first hurdle does the state court take the second step: whether the application contains specific sufficient facts establishing a prima facie case for a constitutional violation. *Id.* The first step is considered a state-law question independent of federal law. *See Ruiz v. Quarterman*, 504 F.3d 523, 527 (5th Cir. 2007). The second step is considered commingled with federal law and constitutes a review on the merits. *See id.* But the application of the two-step process is sequential. *Rocha*, 626 F.3d at 834. Where the state court determines

that when the initial application was filed the factual basis for the claim was available, the analysis stops. *See id.* The applicant has failed to meet the state-law requirements for a subsequent application, and the state court dismisses the claim. Such a dismissal is an adequate and independent state-law ground barring federal merits review. *See id.* at 835.

Such is Reynoso's situation. In state court, he argued only that he failed to present his claim earlier because he was mentally impaired and because his state habeas counsel abdicated counsel's responsibilities. (2 SHCR 65–83.) Such explanations acknowledge that the actions or inactions of Reynoso and counsel were not reasonable. *See* Art. 11.071, § 5(e). Had Reynoso exercised reasonable diligence, he could have presented the claims in his initial application. Because he does not plead newly arising facts, the state-law analysis ended and the state court's dismissal constituted and independent and adequate state-law ground supporting the dismissal. *See Rocha*, 626 F.3d at 835. And because the state court dismissal relied upon a state-law ground independent of federal law and adequate to support the dismissal, federal merits review is barred. *See id.*

### B.   In the alternative, Reynoso does not show that he received ineffective assistance of counsel at sentencing.

But even were this Court to review the claim on the merits, it would not find Reynoso entitled to relief. Reynoso alleges he was denied effective assistance when counsel at sentencing failed to investigate and present certain mitigating

evidence. (Am. Pet'n at 18–59; ECF No. 20.) The evidence at issue is that suggesting childhood hardship and mental impairment.

A petitioner who wishes to show ineffective assistance of counsel must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687–88. In determining the merits of such a claim, courts must be "highly deferential" to counsel's conduct. *Id.* at 689. A reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.* at 690. The petitioner must overcome the presumption that under the circumstances the challenged action might be considered sound trial strategy. *See id.* In fact, a "conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *St. Aubin v. Quarterman*, 470 F.3d 1096, 1102 (5th Cir. 2006) (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983)).

A reviewing court need not consider the deficiency prong if it concludes that the petitioner has shown no prejudice. *Strickland*, 466 U.S. at 697. Moreover, the petitioner may not simply allege, but must "affirmatively prove"

prejudice. *Id.* at 693. To show prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The burden of proof in a habeas corpus proceeding is upon the petitioner. *Martin v. Maggio*, 711 F.2d 1273, 1279 (5th Cir. 1983). Because the issue of ineffective assistance is a mixed question of law and fact, *see Strickland*, 466 U.S. at 698, the court below reviewed the state court decision using the "unreasonable application" standard set out in § 2254(d)(1). *See Nobles v. Johnson*, 127 F.3d at 416.

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Strickland*, 466 U.S. at 691. The reasonableness of counsel's actions may be determined or influenced by the petitioner's own statements or actions. *Id.* Counsel's actions usually are based on informed strategic choices made by the counsel and on information supplied by the petitioner. *Id.* Such information determines what investigation decisions are reasonable. *Id.* For example, when the facts supporting a certain defense have been supplied by the petitioner himself, the need for additional investigation may be diminished or eliminated. *Id.* Also, when the petitioner gives counsel reason to believe that pursuing a

certain investigation would be fruitless or harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. *Id.* Inquiry into counsel's conversations with the petitioner are important to a proper assessment of counsel's investigation decisions. *Id.*

### 1. Reynoso offers nothing to rebut the presumption that counsel's actions were driven by a sound strategy.

This ineffective-assistance claim, including the legal theory and evidence, was never presented to the state court system in a procedural posture that would ensure merits review. *See Dupuy*, 837 F.2d at 702. And the state court rejected the claim not after a merits review but on procedural grounds. *See Coleman*, 501 U.S. at 726. Hence, this pleading cannot refer to the state-court findings and conclusions.

Reynoso fails to offer evidence of his trial counsel's sentencing strategy. A reviewing court must presume the counsel's actions were reasonable. *See Strickland*, 466 U.S. at 690. And Reynoso must rebut that presumption. *See id.* But Reynoso offers nothing in rebuttal. He offers no evidence of counsel's strategy and no evidence of facts supplied to counsel by Reynoso in anticipation of sentencing. *See Strickland*, 466 U.S. at 691. In the absence of any such evidence, Reynoso fails to rebut the presumption of sound trial strategy. *See id.*

At trial, counsel offered sentencing evidence of good behavior and character, childhood hardship, mental impairment, and drug use. Counsel's

actions at sentencing do not reflect a strategy that "so ill chosen that it permeate[d] the entire trial with obvious unfairness." *St. Aubin*, 470 F.3d at 1102. Because Reynoso offers no evidence of counsel strategy and offers no evidence of Reynoso's contribution to that strategy, Reynoso fails to rebut the presumption that counsel strategy was sound. *See Strickland*, 466 U.S. at 690. And Reynoso does not show that an objectively reasonable counsel would have been required to offer the evidence and witnesses he offers to this Court. *See id.*

### 2. Much of the evidence offered to this Court in mitigation was offered to the jurors at trial.

Much of the biography offered to this Court was, in fact, offered to the jurors. For example:

· Reynoso's mother abandoned the family when he was thirteen. (15 RR 95–96; Am. Pet'n at 31, 33, 34.)

· Before his mother left, Reynoso was a normal boy who did well in school and was involved in athletics. (15 RR 228, 231; 16 RR 44, 67, 75, 192; Am. Pet'n at 38.)

· After Reynoso's mother left, he became depressed and anxious and started using drugs, including marijuana, and started sniffing glue. (15 RR 96,101–02, 204; 16 RR 77, 113–14, 174–75; Am. Pet'n at 35, 40.)

· He also abused the prescription drug, Xanax. (15 RR 213–14; 16 RR 176; Am. Pet'n 31, 33, 34, 35, 36.)

• His father was a heavy drinker, some said an alcoholic. (16 RR 79; Am. Pet'n at 31.)

• Although his father provided food and shelter for his children, he was not affectionate. (15 RR 129, 201; 16 RR 44, 69, 79; Am. Pet'n at 34.) At home he would just sit on the sofa, drink beer, and watch television. (16 RR 79, Am. Pet'n at 31.)

• Reynoso did well in a structured environment, such as boot camp or the Texas Youth Commission, but when released went back to his old ways. (14 RR 21–22; 15 RR 106; 16 RR 171–72; Am. Pet'n at 34, 44.)

• Several times he tried to commit suicide. (15 RR 102–03, 152; Am. Pet'n at 35, 44.)

• In one attempt, he drove his car off an overpass. (15 RR 99; Am. Pet'n at 47–48.)

• After the wreck, he began having problems with seizures. (15 RR 99; Am. Pet'n at 48.)

• Reynoso had two children with his sometimes girlfriend, Linda Robles, but became depressed when she withheld access to the children. (15 RR 145–46; Am. Pet'n at 50.)

• When he had access to his children, he was a good father.  (15 RR 130–31, 169; 16 RR 13; Am. Pet'n at 50.)

• As a teenager and young adult he got involved with a gang, the VCV, the "Vatos Con Valos," or "Dudes with Balls," or "Guts." (16 RR 205–06; Am. Pet'n at 41.).

• He wished to leave the bad influences of Houston and move to Corpus Christi, where his grandmother lived. (15 RR 135; Am. Pet'n at 50–51.)

• Once, after his father struck Reynoso and left a mark on his face, Child Protective Services got involved. (16 RR 43, 178; Am. Pet'n at 39.)

• His step-brother, Armando, was sometimes violent and at least once beat up Reynoso. (15 RR 201, 16 RR 178–79; Am. Pet'n at 39.)

• Reynoso began working at sixteen and held several legitimate jobs. (16 RR 180–82; Am. Pet'n at 46.)

• He had been drinking and using Xanax when he went on his final crime spree. (16 RR 162–63; Am. Pet'n at 51.)

Any additional witnesses offering the same narrative would have been cumulative only. *See, e.g., Nobles*, 127 F.3d at 419 (finding state court's application of Strickland reasonable "[g]iven the cumulative nature of the omitted evidence"); *Motley v. Collins*, 18 F.3d 1223, 1228 (5th Cir. 1994) (finding no ineffective assistance where unpresented evidence "merely corroborated the substantial trial testimony"); *Brogdon v. Blackburn*, 790 F.2d 1164, 1168–69 (5th Cir. 1986) (finding no ineffective assistance where the unpresented evidence

"merely cumulative"). A reviewing court must be "particularly wary of 'arguments [that] essentially come[] down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.'" *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)). Hence, much of the evidence offered to this Court, evidence that Reynoso argues should have been offered to the jurors, was, in fact, offered to the jurors.

### 3.   Additional details would have made no difference.

Much of the evidence that Reynoso offers to this Court is a more detailed version of Reynoso's biography. For example, the narrative offered to this Court includes his family's change of addresses (Am. Pet'n at 36, 38, 40), the names of Reynoso's schools (*id.* at 38, 40), his father's speaking in a disparaging manner to his children (*id.* at 39), the description of the Monte Beach Park area of Houston as a "ghetto" with open drug- and alcohol-use (*id.* at 37), the Reynoso family-gatherings at the park with drinking and fighting (*id.*), Reynoso's much-beloved uncle dying (*id.* at 41), Reynoso's being fired from his job at the auto body shop where his father worked (*id.* at 46), Reynoso's being found by his father cowering in a closet with a handgun (*id.* at 48), and Reynoso's feigning

unconsciousness at a fast-food restaurant to avoid some guys he thought were following him (*id.*).

Again, the additional details comes down to a matter of degrees, a matter of how much detail to offer. *See Dowthitt*, 230 F.3d at 743. Reynoso does not show that reasonable counsel would have been required to present the evidence. *See St. Aubin*, 470 F.3d at 1102. And, considering the evidence of the crime itself and of Reynoso armed-robbery spree, Reynoso does not show that had the omitted evidence been presented, there was a reasonable probability that the sentencing result would have been different. *See Strickland*, 466 U.S. at 694.

### 4. A reviewing court must be deferential when it comes to evaluating counsel decisions regarding two-edged evidence.

Reynoso offers an affidavit-report from Dr. Richard Dudley, a psychiatrist, who reviewed the Reynoso's life history developed by the federal habeas counsel and the trial record. (Am. Pet'n at 53–59; Ex. 17; ECF No. 20-18.) The doctor did not interview Reynoso. (Am. Pet'n at 53.) Dr. Dudley said that Reynoso had been exposed to violence over the years. (Am. Pet'n at 54; ECF No. 20-18 at 3, para. 7.) The doctor said that the exposure indicated that Reynoso "evidenced what at least appears to be various psychiatric signs and symptoms associated with/that often result from such exposure." (Am. Pet'n at 54; ECF No. 20-18 at 3, para. 7.) The signs and symptoms could include "increased autonomic hyperreactivity and the perception of the world and others as dangerous." (Am. Pet'n at 54; ECF No.

20-18 at 3, para. 7.) Dr. Dudley said Reynoso's symptoms could be "exemplified" by his "quickness to perceive betrayal, his distrust [of] and difficulty with authority figures, and his extreme reactivity to perceived threat." (Am. Pet'n at 54; ECF No. 20-18 at 3, para. 7.) His being abandoned by his mother and his unnurturing father deprived Reynoso of parental support to help him deal with his traumas, the doctor said. (Am. Pet'n at 54; ECF No. 20-18 at 3, para. 7.) To deal with his traumas and his depression, the doctor said, Reynoso self-medicated. (Am. Pet'n at 55; ECF No. 20-18 at 4, para. 9.) Dr. Dudley said that additional investigation was needed. (Am. Pet'n at 55; ECF No. 20-18 at 4, para. 10.) He said any decision not to present mental-health evidence could not have been based on "full knowledge of what that testimony might have included." (Am. Pet'n at 55–56; ECF No. 20-18 at 5, para. 13.)

First, because the state court rejected this ineffective-assistance claim on procedural grounds, the court did not adjudicate the claims on the merits. *See* 2254(d). But had the state court adjudicated the claim on the merits, this Court would be required to evaluate the state court's decision not in light of the evidence presented to this Court, but in light of the evidence presented to the state court. *See Pinholster*, 2011 U.S. LEXIS 2616, at *21. Hence, this Court could not consider Dr. Dudley's report.

But even were this Court to consider that evidence offered by Dr. Dudley, this Court would not find Reynoso received ineffective assistance. *Strickland*, 466 U.S. at 687. Dr. Dudley's evidence is two-edged evidence, evidence that could be both mitigating and aggravating. While the evidence showing Reynoso's possible mental infirmity might show that he is less culpable, it also might show that he poses a future danger. Counsel is not required to offer such evidence and is entitled to use his judgment about its benefit. *See Martinez v. Dretke*, 404 F.3d 878, 889–90 (5th Cir. 2005) (noting deference is to be given counsel's informed decision to avert harm that may befall the defendant by not submitting evidence of this nature that double-edged evidence); *Kitchens*, 190 F.3d at 703–04 (holding that tactical decision not to pursue and present potential mitigating evidence on the ground that it is double-edged in nature objectively reasonable); *Boyle v. Johnson*, 93 F.3d 180, 188 (5th Cir. 1996) ("Heavy deference is owed trial counsel when deciding as a strategical matter to forego admitting evidence of a 'double-edged nature.'"). The evidence also is cumulative. *See Nobles*, 127 F.3d at 419; *Motley*, 18 F.3d at 1228; *Brogdon*, 790 F.2d at 1168–69. The jurors had before them evidence of Reynoso's childhood and background, including his treatment for depression and his drug use. The evidence offered by Dr. Dudley would not entitle Reynoso to relief in connection with his ineffective-assistance claim. *See Strickland*, 466 U.S. at 687.

## II.  The Constitution Does Not Require That the Texas Death Penalty Statute Assign a Burden of Proof on the Mitigation Question.

Reynoso alleges that the Texas death penalty statute is unconstitutional[11] because it does not assign a burden of proof on the mitigation issue. (Am. Pet'n at 62–65; ECF No. 20.) He relies upon *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); and *Blakeley v. Washington*, 542 U.S. 296 (2004). The Court of Criminal Appeals rejected his Eighth Amendment claim, noting that it had addressed the issue previously. *Reynoso v. State*, 2005 Tex. Crim. App. Unpub. LEXIS 50, at *10–11. This circuit has rejected this argument. *See Ortiz v. Quarterman*, 504 F.3d 492, 505 (5th Cir. 2007); *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007). Relief on this claim must be denied.

## III.  The Constitution Does Not Require That the Mitigation Issue at Sentencing Be Subject to Evidentiary Sufficiency Review.

Reynoso alleges that the Texas death penalty system is unconstitutional because the system does not permit appellate review of the sufficiency[12] of the

---

[11] In state court, Reynoso raised an Eighth Amendment claim. (Appellant's Am. Br. at 28, *Reynoso v. State*, No. AP-74,952.) To the extent that before this Court he raises claims grounded in the Fifth, Sixth, and Fourteenth amendments, because the claims were never presented to the state court, they are defaulted. *See Coleman v. Thompson*, 501 U.S. at 735 n.1.

[12] To the extent that Reynoso complains of the failure of the system to allow a factual sufficiency review, factual sufficiency is a creation of the state constitution and implicates no federal right. *See Woods v. Cockrell*, 307 F.3d 353, 358 (5th Cir. 2002).

evidence supporting the jurors answer to the mitigation special issue. (Am. Pet'n at 65–67; ECF No. 20.) The Court of Criminal Appeals rejected Reynoso's Eighth Amendment claim, noting that it had addressed the issue previously. *Reynoso v. State*, 2005 Tex. Crim. App. Unpub. LEXIS 50, at *10–11. This claim has been rejected by the Fifth Circuit y. *See Adams v. Thaler*, No. 10–70023, 2011 U.S. App. LEXIS 6806, at *39–40 (March 31, 2011); *Rowell v. Dretke*, 398 F.3d 370, 378 (2005); *Woods v. Cockrell*, 307 F.3d 353, 359 (2002). Relief on this claim must be denied.

## IV.   The Term "Probability" in the Mitigation Special Question Does Not Dilute Impermissibly the Beyond-a-Reasonable-Doubt Standard.

Reynoso alleges that the Texas death penalty statute is unconstitutional because the term "probability" in the future-dangerousness special issue dilutes impermissibly the standard of "beyond a reasonable doubt." (Am. Pet'n at 67–70; ECF No. 20.) The Court of Criminal Appeals rejected Reynoso's Eighth Amendment claim, noting that it had addressed the issue previously. *Reynoso v. State*, 2005 Tex. Crim. App. Unpub. LEXIS 50, at *11. The Fifth Circuit has rejected this claim. *See Kerr v. Thaler*, 384 F. App'x 400, 404 (2010), *cert. denied*, 131 S. Ct. 907 (2011); *Scheanette*, 482 F.3d at 827.

## CONCLUSION

This Court should grant the Director's motion for summary judgment, should deny Reynoso's petition for writ of habeas corpus with prejudice, and should deny a certificate of appealability on all of Reynoso's issues.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

   s/  Thomas M. Jones
THOMAS M. JONES*
\*Attorney-In-Charge     Assistant Attorney General
Postconviction Litigation Division

State Bar No. 00784357
Southern District Bar No. 29084

P. O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1400
Fax No. (512) 936-1280
E-mail: Thomas.Jones@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

-49-

## CERTIFICATE OF CONFERENCE

Because this motion seeks summary judgment, no certificate of conference is required. *See* LR 7.1.D (citing Fed. R. Civ. P. 56).

      s/ Thomas M. Jones
THOMAS M. JONES
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on the April 26, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Counsel for Reynoso:

Edward A Mallett
Mallett & Saper, L.L.P.
600 Travis, Suite 1900
Houston, TX 77002-2911
Ph.: 713-236-1900
Fax: 713-228-0321
Email: edward@mgscounsel.com

      s/ Thomas M. Jones
THOMAS M. JONES
Assistant Attorney General